ALFRED BLAKER, *as Executor of the last will of John Hood, deceased, et al.,* v. HOOD & KINCAIDS *et al.*

1. CONSTITUTIONAL LAW—*Regulation of Banks.* The provisions of the constitution authorizing the organization and control of banks of circulation do not limit the legislative power, nor operate to prohibit the enactment of laws imposing reasonable regulations upon banks of deposit and discount.

2. ———— *Valid Statute.* The act providing for the organization and regulation of banks, (Laws of 1891, ch. 43,) is *held* to be within the scope of the police power of the state, and not an unconstitutional infringement of private rights.

3. ———— *Title of Act.* The act does not contravene the constitutional provision which requires that "No bill shall contain more than one subject, which shall be clearly expressed in its title."

*Error from Linn District Court.*

ATTACHMENTS by *Alfred Blaker* and others against *Hood & Kincaids,* and *O. E. Morse,* as receiver of the firm of *Hood & Kincaids.* From an order discharging the attachments, made at the October term, 1893, plaintiffs bring error. The material facts appear in the opinion herein, filed June 9, 1894.

*James D. Snoddy, R. W. Blue,* and *J. T. Pringle,* for plaintiffs in error:

1. The act (chapter 43, Laws of 1891) is broader than the title and contains more than one subject. *The State v. Barrett,* 27 Kas. 213; *Weyand v. Stover,* 35 id. 551; *Comm'rs of Cher-*

*okee Co. v. The State, ex rel.,* 36 id. 339; *Wilkinson v. Savings Bank,* 52 id. 718; Cooley, Const. Lim. 176, 178.

2. The constitution of the state of Kansas gives to the legislature no power to regulate or control banks of discount and deposit. *Pape v. Capitol Bank,* 20 Kas. 440. Article 13 of the constitution is the expression of the ultimate sovereignty of the state upon the subject of banking. The people, by the grant of the power expressed in that article, reserved all other power upon that subject to themselves. Without the grant of such power, no power to regulate or control such banks is possessed by the legislature, except they be corporations organized under a general law providing for such organizations. Bill of Rights, § 20; *Leavenworth Co. v. Miller,* 7 Kas. 489, 491; *The State, ex rel., v. Nemaha Co.,* 7 id. 554.

3. Under article 12 of the constitution, the legislature has power to create corporations to transact banking business, except issuing notes as a circulating medium, and to regulate the same; but *individuals and partnerships are expressly excluded from the grant of legislative power conferred by article 12.* Const., art. 12, § 6.

4. The business of banking is not a franchise, nor does it fall within the police powers of the state. *The State v. Scougal,* 51 N. W. Rep. 858; same case, Lawyers' Rep. Annot., book 15, 477, and cases cited in opinion and in briefs for defendant; Morse, Banks, § 13; Cooley, Const. Lim., 4th ed., 746; Tied. Lim. of Police Powers, § 102; *Bank of Augusta v. Earle,* 13 Pet. 595; *Curtis v. Leavitt,* 15 N. Y. 60, 79; *In re Jacobs,* 98 id. 98; *Butchers' Union etc. Co. v. Crescent City etc. Co.,* 111 U. S. 746; *Civil Rights Cases,* 109 id. 3; *People v. Gillson,* 109 N. Y. 398; *People v. Marx,* 99 id. 377; *Slaughter-House Cases,* 16 Wall. 36; *People, ex rel., v. Otis,* 90 N. Y. 52; *The State v. Goodwill,* 33 W. Va. 179; same case, Lawyers' Rep. Annot., book 6, 622, and cases cited in opinion and notes to case; *Mugler v. The State of Kansas,* 123 U. S. 623.

5. The right to carry on the business of banking, at common law, belonged to the individual as a right, and might be carried on by an individual or a partnership in all its various

relations, even to the extent of issuing notes as a circulating medium to be used as money, as any other trade or occupation or business. *N. Y. F. Ins. Co. v. Ely*, 2 Cow. 678–710; *Curtis v. Leavitt*, 15 N. Y. 9, 60, 80; *Bank of Augusta v. Earle*, 13 Pet. 519–595; *Attorney General v. Utica Ins. Co.*, 2 Johns. Ch. 371, 377; Morse, Banks, p. 1; *People v. Doty*, 80 N. Y. 225.

6. This case of *People v. Doty*, supra, draws a clear distinction between "individual bankers," which words formed a phrase which in the law of New York had a technical meaning, and private bankers, such as Hood & Kincaids were, and holds distinctly that the laws of New York did not extend to private bankers or private banks. The failure to observe this distinction has probably led to the citation of New York cases in support of the view of the defendants in these cases.

*Ryan v. Ray*, 4 N. E. Rep. (Ind.) 214, which is also relied upon to support the same view, is a case involving a law providing for the creation of corporations, in which there is no reference to private banks or private bankers.

The North Dakota case, *The State v. Woodmanse*, 46 N. W. Rep. 970, is at war with all authority, so far as it relates to the business of private banking which does not undertake to issue notes for circulation as money. Governmental control of banks has extended only to corporations created by the government of the nation or state, and to banks of issue. Until the North Dakota case suggested that the business of a private bank (not a bank of issue) was within the misty realm of the police power of the state, no one had ever supposed that it was. Hence the court could well say there never was any question raised in regard to it. That court might waste fully as much diligence in searching for authority denying the axiom, "Things which are equal to the same thing are equal to each other," and with the same result.

The cases of *The State v. Commercial Bank*, 44 N. W. Rep. (Neb.) 998, and *Stone v. Dodge*, 56 N. W. Rep. (Mich.) 75, both relate to corporations organized under the statute, and

each decision is the construction of the statute of the respective state.  The Nebraska case decides a question of the jurisdiction of the supreme court and a question of pleading, and that the property of a corporation which has ceased to do business is a trust fund for the creditors, and that the rights of the general creditors to that fund are superior to the rights of the stockholders of the corporation.  The Michigan case decides the question, under the statute of that state, whether a stockholder can set off a certificate of deposit, purchased by him after the appointment of receiver, against his liability as a stockholder.  We do not just see how these decisions shed light upon the vital question in this case, which is one of legislative power to put under the surveillance of the state the private business of a citizen, which business is not injurious to the health, morals or safety of the public.

*J. D. McCleverty*, for defendants in error:

1. The main if not the only contention in this case is, that the bank act of Kansas is unconstitutional.  In considering this question, it is very necessary to bear in mind that a state legislature is, theoretically and in fact, clothed practically with unlimited power, except such limitations as appear in the state or federal constitution.  The constitution of the United States contains no limitation, nor does our state constitution, except as to banks of issue, as declared in *Pape v. Capitol Bank*, 20 Kas. 440.  Hence the legislature had full power to enact any law which would not infringe upon any natural personal right, and especially could it enact any law which embodied a proper exercise of the police power.  Even many things which at first blush appear to be natural personal rights are held and generally assented to as properly within the police power, and it is probably safe to say that the rule as to police power is that it may be exercised to control or prohibit any wrong, whether to person or property.

If, then, it be conceded, as it must be, that the business of banking is so far within the police power as that such business may be regulated by affixing penalties for usury, or for

receiving money upon deposit while insolvent, why may not the general public, by virtue of this same police power, be further protected by such regulations as the lawmaking power may see fit to enact? Banking is in a sense a public business, and so much has it come to be so considered that people look for it to be regulated by law, and their rights and interests to be protected by law.

New York has had a bank act regulating the banking business for a great many years, which, from *People v. Doty,* 80 N. Y. 230, and *Leavitt v. Blatchford,* 17 id. 526, and cases cited, has been repeatedly sustained, and this in part because the individual had accepted the law and voluntarily acted under it, as was true of Hood & Kincaids in this case. See, also, a well-considered case in Michigan, *Bissell v. Heath,* 57 N. W. Rep. 585. See, also, *Ryan v. Ray,* 4 N. E. Rep. (Ind.) 214.

Very recently some cases have been decided in the Dakotas covering the questions at issue here, and with respect to laws similar to ours. In North Dakota, the law prohibits private individuals from doing a banking business, and confines that privilege to corporations organized under that act. In *The State v. Woodmanse,* 46 N. W. Rep. 970, the defendant was arrested for the offense of carrying on a banking business as an individual in violation of that law, and brought a *habeas corpus,* raising the question of the constitutionality of the law, upon the ground that it deprived him of a natural personal right. The court very thoroughly discusses the question, and, on page 971, says:

"It is true that it has been held that the provisions relative to personal liberty found in our constitution might be violated by the enactment of a statute which operated to deprive a citizen of the right to pursue a lawful trade or avocation. *In re Jacobs,* 98 N. Y. 98; *People v. Marx,* 99 id. 377; 2 N. E. Rep. 29. But, on the other hand, it is conceded that the business of banking, by reason of its very intimate relations to the fiscal affairs of the people and the revenues of the state, is and has ever been considered a proper subject of legislative control, and strictly within the domain of the internal police power of every state. As a matter of fact, we have

been unable to find an authority, and we have searched diligently, which has ever questioned the right of the legislature, in the exercise of the police power, to regulate, restrain and govern the business of banking."

South Dakota also has a similar law, and in *The State v. Scougal*, 51 N. W. Rep. 860, the court, in a very labored, and, it might almost be said, illogical decision, hold the law unconstitutional, but make a declaration or admission which would have forced them to an opposite conclusion, had our law been before that court  Thus it will be noticed that, had the South Dakota law provided, as does our law—§ 17, ch. 43, Laws of 1891—simply "reasonable regulations," applying to individuals, firms and corporations alike, that court would have sustained the constitutionality of their law; so that even that case clearly upholds our law, and is an authority in favor of the rule that the banking business, in any and all of its phases, is within the police power of the state.

2. An examination of our bank act will disclose that, so far as it affects third parties, it is merely a special·assignment act for banks.  It requires certain reports from bankers—requires those engaged in banking to submit to certain inspections and examinations—and this to afford information as to their solvency.  This portion of the law is not before the court in this case, though really it is the portion which is assailed as unconstitutional.  The question raised here is as to the right of the legislature to provide by law for the disposition and application of the property of insolvent bankers, which is really a phase of insolvency proceedings.

3. There is another principle upon which this bank act can be sustained as to these attachment creditors.  This law was passed in 1891.  The record shows that Hood & Kincaids, by a public declaration as provided in that law, accepted it, and have since then constantly proceeded and acted under it.  All of these attachment creditors except one since that date created the liabilities sued upon, while that one accepted interest payments and extended the time of payment.  Thus all, with

full knowledge, have made and brought these liabilities within this law. What is meant is, that the only respect in which complaint could be made against this law would be the possible extent to which it would affect the obligation of contracts, and that could only be as to then existing contracts, and if any one then a creditor questioned the application of this law to his case, he would be obliged to attack it within a reasonable time, or be estopped by his acquiescence. This doctrine is declared by the supreme court of the United States in *Denny v. Bennet*, 128 U. S. 489, with reference to the Minnesota assignment law, which dissolves all attachments within a limited time where an assignment is made, and held that all parties dealing with a citizen of Minnesota after the time of the enactment of that law would be held bound by it, though citizens of another state, and that attachments in his favor should be dissolved, or that the officers acting thereunder would be liable in trespass. See, also, *The State v. Commercial Bank*, 44 N. W. Rep. (Neb.) 998, and *Stone v. Dodge*, 56 N. W. Rep. (Mich.) 75, both sustaining the validity of similar bank acts.

4. Counsel for plaintiffs in error claim that the act is broader than the title, and that it contains more than one subject. The act is very similar to the national-banking act, and from the statements in reported cases seems quite similar to the laws in most of the states. In *The State v. Woodmanse*, 46 N. W. Rep. 970, and *Bissell v. Heath*, 57 id. 585, the same question was raised, and the title and act held good.

This court, too, has several times passed upon this question, and in *The State v. Barrett*, 27 Kas. 213; *The State v. Curtis*, 29 id. 384, and *Comm'rs of Cherokee Co. v. The State, ex rel.*, 36 id. 337, declared the rule to be, that this "provision must not be enforced or construed in any narrow or technical way, but must be construed liberally on one side, so as to guard against the abuse intended to be prevented by it, and liberally on the other side, so as not to embarrass or obstruct needed legislation;" 27 Kas. 214; and that, "in determining whether

an act of the legislature is constitutional, it is the duty of the courts to give such a construction to it, if possible, as will uphold the act." 36 Kas. 337.

If the receiver was rightfully appointed, then the property of Hood & Kincaids upon which the attachments were levied was in the custody of the law at the time of the levy of the attachments, and not subject to levy. *Davis v. Gray*, 16 Wall. 218; *Booth v. Clark*, 17 How. U. S. 321; 20 Am. & Eng. Encyc. of Law, p. 14; High, Rec., § 348.

The opinion of the court was delivered by

JOHNSTON, J.: The firm of Hood & Kincaids engaged in the general banking business, at Pleasanton, in 1883, and continued in that business without state regulation until September, 1891, when, in pursuance of the banking law of 1891, the firm transmitted to the bank commissioner the verified statement and report required by that act. The commissioner, finding that the bank had complied with the provisions of law, issued a certificate to Hood & Kincaids, authorizing them to do a banking business at Pleasanton, and they continued to transact business under the supervision of the commissioner until July, 1893, when the bank commissioner, upon examination, found the bank to be insolvent. He at once took possession of the property, assets and books of the bank, and on July 19 the attorney general began an action in the district court, and secured the appointment of O. E. Morse as receiver. The firm of Hood & Kincaids appeared, and admitted the insolvency as alleged, and consented to the appointment. Soon after the appointment of the receiver, a number of the creditors of the firm of Hood & Kincaids caused attachments to be levied upon the property in the hands of the receiver. Motions to discharge the attachments were made by the receiver, and the attaching creditors also filed motions asking that the order appointing the receiver be set aside, the receiver discharged, and the property in his hands turned over to the sheriff, to be held by him under the attachments. The motions to discharge the

attachments were sustained, and those made to set aside the order appointing the receiver were overruled. The attaching creditors complain of these rulings and bring them here for review.

The validity of the banking law of 1891, in pursuance of which the receiver was placed in charge of the insolvent bank, is the principal question to be settled here. It is contended that the act is objectionable on several constitutional grounds, but the main one is that it authorises an undue interference with private business. It provides for the organization of corporate banks, and for the regulation of all banking business, except that which is done by national banks, whether conducted by corporations, partnerships, or individuals. It creates the office of bank commissioner, and provides that all those engaged in the banking business shall make reports to him of their resources and liabilities, requires them to submit to inspection and investigation in order to ascertain their financial condition, and prescribes methods of business intended to protect the depositors and patrons of such banks. (Laws of 1891, ch. 43.) An examination of the provisions of this act shows that no one is prohibited from engaging in the business of banking. No special privileges or immunities are conferred, and no distinction is made between corporate, partnership or individual banks. All are permitted to engage in the business, and all are subject to the same control, and to like penalties for violation of its provisions. There is no room for the contention that article 13 of the constitution withholds from the legislature power to regulate and control banks of discount and deposit. It was held, in *Pape v. Capitol Bank,* 20 Kas. 440, that this article of the constitution applies only to banks of issue, and does not prohibit the legislature from creating banks of deposit and discount. The provision of the constitution authorizing the organization and control of banks of circulation is not the end of the legislative power. Its power is supreme, except where it is restrained by the funda-

1. Constitutional law—regulation of banks.

mental law, and the constitutional limitations as to banks of issue do not operate to prohibit the legislature from organizing and regulating banks of deposit and discount, and providing for the safe-keeping or loaning of money by such banks. The right to organize and control corporate banks is conceded, but it is contended that the banking business is not a franchise, but belongs to all individual citizens as a common right, the exercise of which cannot be denied or subjected to police regulation. The argument and authorities cited by counsel for plaintiffs in error are mainly directed to the contention that the legislature cannot withhold from individuals the right to engage in banking, and confer the privilege alone upon incorporated companies. This contention is not a matter of concern at this time, as our statute does not pretend to limit the business to incorporated companies, nor to discriminate between corporations and individuals. The question with us is whether the banking business is of such a character as to warrant the legislature, in the exercise of the state's police power, to impose reasonable regulations upon the means and methods by which it is conducted. There are many occupations and lines of private business which the legislature, in the exercise of the internal police power, may rightfully regulate. Tiedeman, in his work on Limitations of Police Power, p. 194, says :

"It will probably not be disputed that everyone has a right to pursue in a lawful manner any lawful calling which he may select. The state can neither compel him to pursue any particular calling, nor prohibit him from engaging in any lawful business, provided he does so in a lawful manner. It is equally recognized as beyond dispute, that the state, in the exercise of its police power, is, as a general proposition, authorized to subject all occupations to a reasonable regulation, wherever regulation is required for the protection of public interests or for the public welfare."

We have frequent instances of the exercise of the police power to prevent imposition and extortion, and of the regulation of employments, and also of business of a *quasi*-public

nature.   By virtue of the police power, regulations have been
imposed on the practice of law, medicine, and dentistry, as
well as upon bakers, millers, and wharfingers; and it has been
accepted as a proper exercise of the police power to regulate
pawnbrokers, junk shops, and loan offices.   Inspection laws,
and those regulating the weighing of commodities offered for
sale, are generally regarded as suitable and valid regulations
of police.  (18 Am. & Eng. Encyc. of Law, 747–759.)   The
right to regulate and control the business of insurance, as well as
that conducted by mills and warehouses, is no longer doubted.
Enactments controlling the loaning of money and regu-
lating the rate of interest upon the same have been sanc-
tioned from the earliest times, and the nature of the business
done by banks in dealing in money, receiving deposits for safe-
keeping, discounting paper and loaning money is
2. Valid statute.  such, and is so affected with a public interest, as
to justify reasonable regulation for the protection
of the people.   The confidential and trust relations which ex-
ist between the bank and its patrons, and the difficulty that
depositors and those dealing with the bank necessarily en-
counter in detecting irregular practices, and in ascertaining
the real financial condition of banks, are sufficient to justify
inspection and control.   Those engaged in the business invite
all in the community to deposit their funds with them, which,
when obtained, are largely used for their profit.   The numer-
ous instances where the earnings and funds of people so depos-
ited are dissipated and lost show the necessity for measures
to protect the people from imposition, extortion, and fraud.
For this reason, most of the states have enacted laws recog-
nizing banking as a *quasi*-public business, and regulating the
same to a greater or less extent.   A well-known author, in
his treatise on banking, uses the following language: "At
common law, the right of banking pertains equally to every
member of the community.   Its very exercise can be re-
stricted only by legislative enactment, but that it legally can
be thus restricted has never been questioned."  (1 Morse,

Banks, §13.)   The same subject was considered in the recent case of *The State v. Woodmanse*, 46 N. W. Rep. (N. D.) 970, where it was said that

"The business of banking, by reason of its very intimate relations to the fiscal affairs of the people and the revenues of the state, is and has ever been considered a proper subject of control, and strictly within the domain of the internal police power of every state.   As a matter of fact, we have been unable to find an authority — and we have searched diligently — which has ever questioned the right of the legislature, in the exercise of police power, to regulate, restrain and govern the business of banking."   See, also, *People v. Insurance Co.*, 15 Johns. 358; *The People v. Barton*, 6 Cow. 290; *Curtis v. Leavitt*, 15 N. Y. 9; *The State v. Williams*, 8 Tex. 255; *Nance v. Hemphill*, 1 Ala. 551; *The People v. Brewster*, 4 Wend. 498.

·  The authority principally relied upon by counsel for the plaintiffs in error is *The State v. Scougal*, 51 N. W. Rep. 858, found also in 15 L. R. A. 477.   The latter case is in conflict with *The State v. Woodmanse*, supra, in holding that the legislature may prohibit private banking, and may inaugurate a system for the state in which the business is made an exclusively corporate franchise, to be carried on only by those who become incorporated, and are willing to subject their business to the restraints and safeguards deemed to be necessary.   In *The State v. Scougal*, supra, it was decided that the business of banking was not a franchise at common law, and was not made such by the constitution, and, further, that it belonged to the citizens of the country generally by common right, and the legislature could not, under the police power of the state, prohibit an individual from engaging in the business, nor confer the privilege exclusively upon corporations.   As no exclusive franchise has been conferred, and no discrimination made against individuals or private banks in our statutes, we are not required to determine which of the conflicting theories should prevail.   Even in the Scougal case, which holds strictly against any discrimination in favor of corporate banks, it is held that, where the law applies to individuals

and corporations alike, reasonable regulations may be imposed. In the course of the decision the court remarked:

"But, assuming that the business of banking we are now considering is clothed with such a public use that it may be controlled by the state—and we think it is so affected with a public interest—still it does not follow that the citizen may be deprived of the right to carry on the business. This, like any other business, may be subjected to reasonable regulations which shall alike apply to all citizens and corporations."

We readily conclude that the regulation of the banking business is clearly within the legislative power, and that the act passed cannot be regarded as an unconstitutional interference with individual rights.

Another objection is that the title of the act contains more than one subject, and contravenes § 16, article 2, of the state constitution. The title is, "An act provividing for the organization and regulation of banks, and prescribing penalties for violations of the provisions of this act." In a broad sense it is an enactment concerning the business of banking, and all of the provisions are fairly compre-

3. Title of act.

hended within this general subject. As has been held, this constitutional provision is not to be construed in any narrow or technical sense, but liberally on one side, so as to guard against the abuse intended to be prevented by it, and liberally on the other side, so as not to embarasss or restrict needed legislation. (*The State v. Barrett*, 27 Kas. 213; *The State v. Curtis*, 29 id. 384; *Comm'rs of Cherokee Co. v. The State*, 36 id. 337; *The State, ex rel., v. Comm'rs of Haskell Co.*, 40 id. 65; *The State, ex rel., v. Sanders*, 42 id. 228; *The State, ex rel., v. Kansas City*, 50 id. 521.

Having determined that the act is valid, it follows that the rulings of the court sustaining the motions to discharge the attachments and overruling the motions to discharge the receiver will be affirmed.

All the Justices concurring.