The State v. Wilson.

### THE STATE OF KANSAS v. HENRY WILSON.

No. 11,310.*   ( 58 Pac. 981.)

1. CONSTITUTIONAL LAW — *Mines and Miners.* "An act to regulate the weighing of coal at the mine," being chapter 188, Laws of 1893 ( Gen. Stat. 1897, ch. 149, § § 48–53; Gen. Stat. 1899, § § 4000–4005), is constitutional and valid as a proper exercise of the police power. It does not purport to prevent the operators of coal-mines and the miners employed by them from making such agreements as they choose concerning the amount of wages to be paid, or anywise infringe upon the freedom of contract.

2. ———— *Mines and Miners—Benefits of "Screen Law."* Where miners are employed at bushel, ton or other quantity rates, it is a valid requirement of the law that the output of coal mined by them shall not be passed over any screen or other device which shall take any part from the value thereof before the same shall have been weighed and duly credited to the employees and accounted for at the legal rate of weights. Information is by this means furnished to the miner by which he may act intelligently and rest his demand for wages upon the calculated results of what he has accomplished in the past. It also affords the operator knowledge, from the use of which wages may be adjusted, based upon known facts. Such law is further beneficial in that it supplies the public with statistics showing the total amount of coal produced in the state.

*For opinion by the court of appeals, see 7 Kan. App. 428.—REP.

Appeal from court of appeals, southern department;
A. W. DENNISON, M. SCHOONOVER, and B. F. MIL-
TON, judges.   Opinion filed November 11, 1899.   Af-
firmed.

STATEMENT.

THE appellant was convicted in the district court
for the violation of section 1, chapter 188, Laws of
1893 (Gen. Stat. 1897, ch. 149, §§ 48–53 ; Gen. Stat.
1899, §§ 4000–4005), entitled "An act to regulate the
weighing of coal at the mine."

It is charged in the information that the Mount
Carmel Coal Company, on or about the 21st day of
October, 1897, was a corporation organized and ex-
isting under the laws of the state of Kansas, engaged
in the business of mining coal from its mines located
in Crawford county, at ton rates, the wages of miners
employed being based upon the quantity of coal pro-
duced by each of them ; that the appellant, Henry
Wilson, was an agent and superintendent of said cor-
poration, having on its behalf the care and manage-
ment of its coal-mines and mining business, with a
large number of miners in his employ at ton rates ;
that as such agent he used certain scales for the pur-
pose of weighing the output of coal at said mines, and
did unlawfully and knowingly employ and make use
of certain devices and screens to screen the output be-
fore the same had been weighed ; that the output of
said miners was screened with the knowledge of and
by virtue of contracts with said miners, and the said
Wilson failed, refused and did not weigh the same be-
fore it was passed over said screens, but unlawfully
directed and caused it to be passed over screens before
the same had been weighed, whereby a large part of
the value was taken therefrom before the same had

been weighed and duly credited to said miners and accounted for at the legal rate of weights as fixed by the laws of the state of Kansas.    Chapter 188, Laws of 1893 (Gen. Stat. 1897, ch. 149, §§ 48–53 ; Gen. Stat. 1899, §§ 4000–4005), reads :

" An act to regulate the weighing of coal at the mine.

" SECTION 1.  It shall be unlawful for any mine owner, lessee or operator of coal-mines in this state, employing miners at bushel or ton rates, or other quantity, to pass the output of coal mined by said miners over any screen or other device which shall take any part from the value thereof before the same shall have been weighed and duly credited to the employees and accounted for at the legal rate of weights as fixed by the laws of Kansas.

" SEC. 2.  The weighman employed at any mine shall subscribe an oath or affirmation, before a justice of the peace or other officer authorized to administer oaths, to do justice between employer and employee, and to weigh the output of coal from mines in accordance with the provisions of section 1 of this act.    Said oath or affirmation shall be kept conspicuously posted in the weigh office, and any weigher of coal, or persons so employed, who shall knowingly violate any of the provisions of this act, shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than twenty-five dollars nor more than one hundred dollars for each offense, or by imprisonment in the county jail for a period not to exceed thirty days, or by both such fine and imprisonment. 

" SEC. 3.  The miners employed by or engaged in working for any mine owner, operator or lessee in this state shall have the privilege, if they so desire, of employing at their own expense a check-weighman, who shall have like rights and privileges in the weighing of coal as the regular weighman, and be subject to the same oath and penalties as the regular weighman.

" SEC. 4.  Any person or persons having or using any scale or scales for the purpose of weighing the

output of coal at mines, so aranged or constructed that fraudulent weighing may be done thereby, or who shall knowingly resort to or employ any means whatever, by reason of which such coal is not correctly weighed and reported in accordance with the provisions of this act, shall be deemed guilty of a misdemeanor, and shall, upon conviction, for each offense be punished by a fine of not less than two hundred dollars nor more than five hundred dollars, or by imprisonment in the county jail for a period not to exceed sixty days, or by both such fine and imprisonment.

" Sec. 5. Any provisions, contract or agreement between mine owners or operators thereof and the miners employed therein, whereby the provisions of section 1 of this act are waived, modified, or annulled, shall be void and of no effect ; and the coal sent to the surface shall be accepted or rejected, and if accepted shall be weighed in accordance with the provisions of this act ; and right of action shall not be invalidated by reason of any contract or agreement.

" Sec. 6. The provisions of this act shall also apply to the class of workers in mines known as loaders, engaged in mines wherein mining is done by machinery. Whenever the workmen are under contract to load coal by the bushel, ton, or any quantity the settlement of which is had by weight, the output shall be weighed in accordance with the provisions of this act."

The constitutionality of the act was sustained by the court of appeals and the judgment of the district court affirmed. ( *The State v. Wilson*, 7 Kan. App. 428, 53 Pac. 371.)

*A. A. Godard*, attorney-general, for The State.
*Morris Cliggitt*, and *Perry & Crain*, for appellant.

The opinion of the court was delivered by

Smith, J. : In this opinion the writer gives the views of a majority of the court.   On the argument

and in the briefs much time and space were consumed in discussion of the question whether the act under consideration affects the right of contract, and whether the law as it reads has a meaning that the wages paid to coal-miners is to be measured by the gross output of valuable product mined and brought to the surface by the laborers employed therein. In our judgment, the law nowise affects the right of contract and does not hinder or prevent the mine operator or miners from making such agreements as they choose concerning the amount of compensation to be paid for labor in mining coal. Nor does the act prohibit the employment of miners at day wages, or make void contracts for the payment of wages based on the quantity of screened coal produced. In fact, the law permits complete freedom of action in the respect mentioned. The act does, however, in positive terms, make it unlawful for any mine owner, lessee or operator of coalmines, employing miners at bushel or ton rates or other quantity, to pass the output of coal mined by said miners over any screen or other device which shall take away any part from the value thereof before the same shall have been weighed and duly credited to the employees at the legal rate of weights fixed by law.

Of the intent of the legislature in enacting the statute it is hardly necessary to inquire. We can see, however, a useful purpose to be accomplished. In the exercise of the police power the legislature may pass such laws as in its judgment are necessary regulating the measuring or weighing of commodities. In *Blaker v. Hood*, 53 Kan. 509, 36 Pac. 1115, it is said :

"By virtue of the police power, regulations have been imposed on the practice of the law, medicine,

The State v. Wilson.

and dentistry, as well as upon bakers, millers, and wharfingers; and it has been accepted as a proper exercise of the police power to regulate pawnbrokers, junk-shops, and loan offices. Inspection laws, and those regulating the weighing of commodities offered for sale, are generally regarded as suitable and valid regulations of police.''

The utility of the act, if we have the right to enter upon such an inquiry, can be defended for the reason that the weighing of the gross output from the mine gives information to the miner, whose labor has separated it from the general mass of the vein, concerning the result of his effort. He is thus advised how much in weight of all grades of this fuel he has extracted from the earth in a day, a month, or a year, enabling him, when armed with this knowledge, to make contracts in the future based upon actual information of the benefits the employer has in the past derived from his labor. Thus informed he may act intelligently, resting his demand for pay on the actual value of his labor as shown by the calculated results of what he has theretofore accomplished. On the other side, the employer may also have this knowledge before his eyes when contracting with the miners for their services, enabling him to make an adjustment of wages based on known facts. By this system of weighing, deception as to the amount of coal mined is rendered impossible and fraud prevented. Standing in the light of such knowledge gained from established data, the miner may make a claim of right to wages he knows he can earn, fortifying his demand by reference to what he has done as found recorded in the weighmaster's books.

Further, it is important that the public should have within reach data sufficient to furnish information regarding the amount of coal produced from the mines

within the state. A compliance with this law provides means for the compilation of statistics showing the entire output of coal. The dissemination of knowledge concerning the wealth and material resources of a state is a laudable employment, and legislation which tends to accomplish or in any way assist in such work ought to be upheld and encouraged. For this object alone the act in question is useful, and, being so, we cannot say that the legislature did not have such purpose in view when the same was enacted. We agree with the court of appeals in saying:

" Counsel throughout their whole argument assume that the object of this act is to regulate the rate of wages to be paid by mine operators to their employees. We think this assumption is unwarranted and that, in so far as the argments of counsel rest upon it, such arguments are irrelevant to the questions which properly arise in the case.

The law is devoted to other purposes than an interference with or a regulation of contracts. It merely prohibits the screening of coal mined at ton or quantity rates before the same is weighed. This is a legitimate exercise of the police power, coming properly within the sphere of legislative action upon the grounds above stated.

The judgment of the district court and of the court appeals will be affirmed.

DOSTER, C. J. concurring.

JOHNSTON, J. (concurring specially) : I think the judgment should be affirmed, and only desire in a few words to add another to the well-stated reasons already given for affirmance. All the authorities unite in sustaining a statute requiring the weighing of a commodity like coal, intended to be sold, and there is

no contention here that this is not a proper exercise of the police power of the state.  The contention is that the statute goes further and interferes with and infringes upon the right to contract, and if it did I would readily agree with my brother SMITH as well as the court of appeals that the act would be invalid.  I think the act requires but little interpretation; in plain terms it requires the weighing of the output of coal before it is disposed of, provides how it shall be done, and prescribes punishment for any evasion or failure to observe its requirements.  Nothing in the language of the act expressly prohibits or interferes with the freedom of contract, and such a meaning can only be found in far-fetched implications or remote inferences. The legislative intent of an act can best be learned from its words, and when the meaning is clear no interpretation is necessary or allowable.  While contemporary history and well-known facts may sometimes be considered in determining the legislative purpose of an act, a court is never warranted in departing from the obvious import of unambiguous language and entering the field of conjecture and speculation in search of a legislative purpose, or in learning it from newspaper statements or the gossip in the corridors of the state-house when the act was passed.

A still more important consideration is that, if the meaning sought to be imported into this act is given, it would, in my judgment, destroy its validity.  If it be conceded that the statute is ambiguous and open to two interpretations, which should be adopted, the one that upholds or the one that defeats ?  The presumption, so far as it can obtain, is that the legislature did not intend to do a vain thing or to enact a statute that was ineffectual and invalid.  Every presumption is in

The State v. Wilson.

favor of the validity of the law, and, if there is room for two constructions, the court, must, in deference to the legislature, assume that it did not intend to violate the constitution, and should therefore adopt the one which would uphold the validity of its act.   In Sutherland on Statutory Construction, section 332, it is said that " where one construction will make a statute void for conflict with the constitution, and another would render it valid, the latter will be adopted though the former at first view is otherwise the more natural interpretation of the language."   ( 23 A. & E. Encycl. of L. 349.)   "It is no part of the duty of the court to be astute in order to invalidate a statute ; it will rather strive to so interpret it as to sustain its validity, and give effect to the intention of the legislature."   (*Ferguson v. Borough of Stamford,* 60 Conn. 447, 22 Atl. 782.) The title to the act, to which we may look as an aid to its construction, does not indicate a purpose on the part of the legislature to trench on the freedom of contract, nor to do anything more than to require the weighing of the output of the coal before it is disposed of ; nor do I find in it any express provision or necessary implication compelling us to impute a purpose to the legislature that would overthrow the validity of the act.

SMITH, J. (dissenting) : The construction applied to this law by the majority of the court seems to me to be a perversion of legislative intent, and we need not go beyond the language of its several sections to ascertain that the obvious and sole purpose of the enactment was to control and restrict the right of contract.   The title, "An act to regulate the weighing of coal at the mine," conceals its true purpose as revealed in the body of the law.   The title only partially

indicates its object. In *Mugler v. Kansas*, 123 U. S. 623, 661, 8 Sup. Ct. 297, it is said:

"The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty — indeed, are under a solemn duty — to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority."

" But the constitution must be interpreted and effect given to it as the paramount law of the land, equally obligatory upon the legislature as upon other departments of the government and individual citizens, according to the spirit and intent of its framers, as indicated by its terms. An act violating the true intent and meaning of the instrument, although it may not be within the letter, is as much within the purview and effect of a prohibition as if within the strict letter." (*District Court Case*, 34 Ohio St. 431, 440).

Analyzing the whole act together, we find that the first section prohibits the passing of the output over any screen which shall take any part from the value thereof before the same shall have been weighed and duly credited to the employees and *accounted for* at the legal rate of weights fixed by the laws of Kansas. This latter clause, employing, as it does, words of well-known import in the commercial world, certainly conveys a meaning at variance with the idea that such crediting *to* employees of *the* gross weight of all the output of value and the " accounting " for the same at the legal rate of weights was intended as a basis for statistics merely, or simply to enlighten the miner for his future guidance concerning the amount of coal mined by him. Section 5 provides:

"Any provisions, contract or agreement between mine owners or operators thereof and the miners employed therein, whereby the provisions of section 1 of

this act are waived, modified, or annulled, shall be void and of no effect; and the coal sent to the surface shall be accepted or rejected, and if accepted shall be weighed in accordance with the provisions of this act; and right of action shall not be invalidated by reason of any contract or agreement.''

If the design of the act is as stated by my brethren, does it further the objects contended for in the opinion to declare, '' and the coal sent to the surface shall be accepted or rejected, and if accepted shall be weighed in accordance with this act, and *right of action shall not be invalidated* by reason of any contract or agreement.'' If to give knowledge to the miner of the amount of labor he had expended in digging a ton of coal was the aim of the statute, why refer to rights of action? The language, '' and right of action shall not be invalidated by reason of any contract or agreement,'' has reference to a remedy sought in the courts by some one having by contract bound himself to do something which this statute, coming in the way, says he cannot do. The obvious meaning is that if a miner contract to take out coal for one dollar per ton for all screened coal mined by him, he must be paid one dollar per ton for the mine run — that is, the total weight of the substance extracted from the earth by him having a marketable value — and all contracts for determining the amount of his compensation on any other basis, when he works by ton or quantity rates, are invalidated. It means that when a miner makes a contract to take out coal at so much per ton for screened coal, the bargain does not bind him; that when he sues his employer for wages the court must not give him judgment, on the contract, but, finding the weight of all coal he has taken out, both screenings and lump, the gross product is to be credited to him and compensation given on the basis of its weight.

Section 5 can certainly have no reference to a right of action of a miner to recover wages computed on the basis of screened coal, for he had such a right of action independent of the statute.  It was manifestly the purpose of the act to give the miner a right of action to recover his wages computed on the basis of coal weighed in accordance with the provisions of the law — that is, computed on the basis of coal weighed before screening — and that notwithstanding any contract to the contrary.  This seems to me to be the plain, palpable and obvious meaning of the statute.

In determining legislative intent, we have the right to consider the nature of the demands upon the lawmakers which induced legislation for the remedy of an existing evil.  As was said by Mr. Justice Valentine, in *City of Topeka v. Gillett*, 32 Kan. 431, 437, 4 Pac. 804 :

" Courts may take judicial notice of the census returns, of the general history of the country, of what the members of the legislature ought to know when passing the statute which the courts are called upon to construe ; and, indeed, of what all well-informed persons ought to know."

We know that the demand for such legislation was based on the claim that coal-miners were not paid enough for their labor ; that they were at the mercy of the operators, who, by screening the product, robbed them of a portion of the proceeds of their labor for which they should have been paid.  The object was to right this wrong, and to this end the statute under consideration was passed.  No clamor rang in the ears of the lawmakers from oppressed and starving miners demanding a law which would supply them with statistics when they were crying for bread.  As we have the right judicially to know what the legislature

ought to have known, for the purpose of arriving at their intent, can we say that it had the remotest design to make a statute for the purpose indicated in the majority opinion? If information to the general public, including the miner and operators, was the object sought, in order that statistics might be based thereon, the legislature was exceedingly magnanimous, under section 3, in affording to the miners the privilege of employing weighmen at their own expense, if they so desired. The right vouchsafed to them of going down in their pockets and paying therefrom the expenses of check-weighmen to determine the output of the mine for statistical purposes was certainly an exhibition of sincere generosity.

Again, no account is required to be kept of coal taken from the mines unless the miners are to be paid at ton, bushel or quantity rates. So the collection of information as to the amount produced depends on the continuance of a ton-, bushel- or quantity-rate method of paying wages. If this system of payment is abandoned there is no preservation of statistics, suggesting the argument that if the furnishing of exact knowledge to the miner and operator was one of the objects of the law, why does not the law require the weighing of coal mined under all circumstances and under every plan of payment? If partial knowledge on this subject was a thing so desirable that a whole legislature was moved to furnish it, why was complete means of knowledge withheld when ample power existed to obtain it?

As against the remote probability that the act, as interpreted by the majority, will result in any benefit to the miner, is the certainty that the public at large will suffer by its enforcement, if the quantity or ton rate of payment prevails. The total output of coal in

the state for the year 1898 was, in round numbers, 3,860,000 tons. It is estimated that about one-third of the production is slack coal which goes through the screens. The cost of this compulsory weighing must be added to the price of the fuel which the consumer (the public) is compelled to pay in order that it may be known with mathematical certainty how many tons the mines of the state have yielded. This tribute is exacted from consumers of Kansas coal to satisfy the contention that the law contemplates some other object than the regulation of wages.

In justifying this legislation as a proper exercise of the police power, I think that power has been unwarrantably extended. Such power must have relation to the health, comfort, safety or necessities of the people. This is asserted in all the books on the subject. It cannot include matters which are connected merely with the *convenience* of the public. In Black on Constitutional Prohibitions, page 82, it is said:

"There is no possibility, upon any principle of logical deduction from the adjudged cases or the nature of the subject, of stretching the limits of the police power so as to make it include matters which are merely connected with the *convenience* of the public. There are decisions which might seem, at first blush, to lend countenance to such a proposition, but an attentive consideration will show that they either used the term in its broad and general sense, or had reference to matters concerning the *safety* of the people, not their convenience."

It is for the courts to define the limits of the police power and confine the same within constitutional bounds. It may be convenient for the miner and the public generally to have the means of knowing how much coal has been mined in the state, for the purposes mentioned in the opinion, but the necessity of

such knowledge is not apparent.   It would be interesting to know with accuracy the total yield of corn in Kansas during the present year.   But the enactment of a law requiring the farmer to measure every bushel of his crop as soon as it is ready for market could hardly be justified, even though it might assist the persons who gathered it in determining the amount of profit the farmer would derive from his labor.   General laws and city ordinances relating to the weighing of commodities before sale have been upheld as coming within the police power for the reason that purchasers are protected.

In the case of *Millet v. The People,* 117 Ill. 294, 7 N. E. 631, 636, the supreme court of Illinois passed upon the validity of an act quite similar to this, relating to the weighing of coal at the mines.   In holding the law unconstitutional, as infringing upon the right to contract, the court answered the argument that the act might be defended on the ground that it required the keeping of a public record for the information of the public.   The court said :

"We recognize fully the right of the general assembly, subject to the paramount authority of congress, to prescribe weights and measures, and to enforce their use in proper cases, but we do not think that the general assembly has power to deny to persons in one kind of business the privilege to contract for labor, and to sell their products without regard to weight, while at the same time allowing to persons in all other kinds of business this privilege, there being nothing in the business itself to distinguish it in this respect from any other kind of business ; and we deny that the burden can be imposed on any corporation or individual not acting under a license or by virtue of a franchise, of buying property and hiring labor merely to furnish public statistics, unless upon due compensation to be made therefor."

It would be a mere affectation of industry to collate here the. great number of decisions which denounce legislation of this kind infringing upon the right to contract by persons *sui juris*, like the miners employed by the appellant, who, according to the agreed facts, "are of full age, sound mind, and of full and legal capacity to contract and be contracted with." The court of appeals had no doubt of its invalidity if its provisions related to the regulation of wages. That court said:

"As we have already stated, we should hold this law to be invalid if it in terms expressed such purpose (the regulation of wages), but neither the title of the act nor the act itself directly or indirectly purports to relate to the matter of wages."

In my judgment, the design of the framers has been misconstrued and perverted. A law thought by them to be endowed with strength and virility, aiming at the correction of abuses in the field of labor, has been disfigured by its interpreters — its true purpose denied. Strained and imaginary reasons are put forward as excuses for its existence, and explanations made of its utility which are highly fanciful and speculative. By a process of refined construction its original identity has been effectually destroyed until recognition by its creators is now impossible.