## McLean v. State.

### Opinion delivered December 10, 1906.

1. MINES AND MINING—VALIDITY OF SCREEN LAW.—Acts 1905, c. 219, § 1, providing that "it shall be unlawful for any mine owner, lessee or operator of coal mines employing ten or more men underground at bushel or ton rates to pass the output of coal mined by said miners over any screen or other device which shall take any part from the value thereof before the same shall have been weighed to the employee," etc., was designed to furnish a basis of the miner's compensation and to secure to him payment for all the coal he mines, and is a valid exercise of the State's police power. (Page 306.)

2. POLICE POWER—REGULATION OF WEIGHTS AND MEASURES.—It is within the State's police power to adopt a uniform system of weights and measures, and to require all persons whose business transactions require the use of same to conform thereto. (Page 308.)

3. CONSTITUTIONAL LAW—EQUALITY OF RIGHTS.—Acts 1905, c. 219, in regulating only those coal mines which employ ten or more men under-

ground, does not conflict with the provisions of the State Constitution (art. 2, § § 2, 3, 8) and of the Fourteenth Amendment to the Federal Constitution securing to all persons liberty and equality of rights under the law. (Page 308.)

4. SAME—RIGHT OF LEGISLATURE TO MAKE CLASSIFICATIONS.—The Legislature may make reasonable classifications and discriminations between different classes of corporations and individuals, so long as equal protection of the laws is not denied to all persons similarly situated. (Page 308.)

Appeal from Sebastian Circuit Court, Greenwood District; *Styles T. Rowe,* Judge; affirmed.

John McLean was convicted of violating Acts 1899, c. 219, known as the Screen Law. It was agreed that he violated the terms of the statute, and the only question raised by the appeal is whether the act is valid.

*Ira D. Oglesby,* for appellant.

The act is in violation of the State Constitution, art. 2, § § 2, 3, 8, 29. And of the Federal Constitution, 14th Amendment, § 1. Similar statutes have been declared unconstitutional. Cooley, Const. Lim. 484-6; Tiedeman on Police Power, 572; 32 N. E. 364; 40 N. E. 156; 22 S. W. 350; 165 U. S. 150; 7 N. E. 631; 35 N. E. 62; 25 Am. St. Rep. 863; 43 N. E. 624; 59 Pac. 340; 184 U. S. 555; 183 U. S. 79; 48 L. R. A. 265; 83 Am. St. Rep. 116.

*Robert L. Rogers, Attorney General,* and *Brizzolara & Fitzhugh,* for appellee.

The act is valid as coming within the police power of the State. Its object is to protect the miner, to see that he is honestly paid for his labor, and to prevent fraud in the measurement of the coal mined. Freund on Police Power, § § 272 to 275. The same law has been enforced many years in other States. Digest, Mo. Stat. 1899, § 8786; Acts W. Va. 1891, c. 82; Gen. Stat. Kan. 1899, § § 4000-5; Rev. Stat. Ind. 1897, § 7840; 36 W. Va. 802; 61 Kan. 34. See also 69 Ark. 521; Snyder on Mines, § 1675. Liberty of contract must give way to public welfare, and the State's right to exercise its police power in restraint of liberty of contract, where the exercise of such power is in the interest of the public welfare, is well estab-

lished. Many laws have been upheld which restrict the freedom of contract concerning matters not affected with a public use in the true sense, but only in the sense of the nature or extent of the private business being affected with public interests. 190 U. S. 169; 183 U. S. 13; 83 Fed. 157; 157 U. S. 160; 113 U. S. 703; 169 U. S. 366; 94 U. S. 113; 9 Me. 54; 10 S. E. 143. Neither is the law invalid because it is made to apply only to coal companies employing ten or more men underground. Freund on Police Power, § § 721-738; 127 U. S. 205; 173 U. S. 404; 125 U. S. 680; 165 U. S. 628; 143 U. S. 517; 179 U. S. 328; 109 Fed. 847; 155 Ill. 166; 182 Ill. 551; 21 Or. 406; 16 Wis. 399. Equal protection is not denied where the law operates alike upon all persons similarly situated. 128 U. S. 578; 42 La. Ann. 8; 104 N. C. 714; 96 Mo. 44; 113 U. S. 32; ib. 709; 120 U. S. 68; 129 U. S. 26; 115 U. S. 321; 170 U. S. 282.

WOOD, J. This appeal questions the constitutionality of the following statute:

"It shall be unlawful for any mine owner, lessee, or operator of coal mines in this State, where ten or more men are employed underground, employing miners at bushel or ton rates or other quantity, to pass the output of coal mined by said miners over any screen or any other device which shall take any part from the value thereof before the same shall have been weighed and duly credited to the employee sending the same to the surface, and accounted for at the legal rate of weights as fixed by the laws of Arkansas, and no employee, within the meaning of this act, shall be deemed to have waived any right accruing to him under this section by any contract he may make contrary to the provisions thereof, and any provisions, contract, or agreement between mine owners, lessees or operators thereof, and the miners employed therein, whereby the provisions of this act are waived, modified or annulled, shall be void and of no effect, and the coal sent to the surface shall be accepted or rejected; and, if accepted, shall be weighed in accordance with the provisions of this act, and right of action shall not be invalidated by reason of any contract or agreement; and any owner, agent, lessee, or operator of any coal mine in this State, where ten or more men are employed under-

ground, who shall knowingly violate any of the provisions of this section, shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than two hundred dollars nor more than five hundred dollars for each offense, or by imprisonment in the county jail for a period of not less than sixty days nor more than six months, or both such fine and imprisonment; and each day any mine or mines are operated thereafter shall be a separate and distinct offense; proceedings to be instituted in any court having competent jurisdiction." Acts 1905, c. 219, § 1.

This legislation is clearly within the scope of the police power. The manifest purpose of the statute is to prevent those who operate coal mines from perpetrating fraud upon laborers whom they have employed to mine coal *by the quantity*. It will be observed that the act does not interfere with the right of the operator to contract with the miners in his employ for the mining of coal by the hour or day, or in any other manner, regardless of quantity, that he deems proper. He is not compelled to have his coal mined and pay for same according to the quantity produced. But if he elects to employ miners to mine coal and to pay for same according to the quantity produced, then the purpose of this law is to secure the laborer against the use by him of any screen or other device "that shall take any *part from the value thereof* before the same shall have been weighed and duly credited to the employee" producing same. Under the provisions of the statute, the operator who has contracted to have his coal mined by the quantity is not required to accept the coal sent to the surface by the miners. The coal "shall be accepted or rejected." But "if accepted," then it "shall be weighed in accordance with the provisions of the act."

The plain purpose of the act therefore is not to prevent the parties from contracting in any manner they deem proper for the production of coal, but rather, after they have contracted for its production according to the quantity produced, to see that such quantity is ascertained by a fixed and definite standard by which neither of the parties can be defrauded. In other words, under this statute, the miner, having contracted with the mine owner or operator to produce a bushel, ton, or

any other quantity of coal at a certain price for the quantity produced, is entitled to have such quantity ascertained by the legal rate or system of weights adopted by the State of Arkansas; and that too without having the output or quantity of coal mined passed over any screen or other device which would take any part from the value thereof, *i. e.*, which would reduce, as ascertained by the weight, the quantity of coal which he had actually mined under his contract. It is certainly within the police power of the State to adopt a uniform system of weights and measures, and to require that all persons whose business transactions require the use of same conform thereto. Kirby's Digest, c. 159; *Blaker* v. *Hood*, 53 Kan. 509; *State* v. *Wilson*, 61 Kan. 34; *State* v. *Peel Splint Coal Co.*, 36 W. Va. 802; Freund on Police Power, § § 272 to 275. The purpose of these statutes, as applicable to coal mines, is, as said by Mr. Snyder, "to furnish a reliable means upon which to base the miner's compensation and to protect him in the payment for all the coal he mines." He therefore "not only has the right to have it justly and honestly weighed in the original form in which he loaded it, but he has the right also to have a true record kept of it." 2 Snyder on Mines, § 1675.

The operators are prohibited from using screens or other device "which shall take any part from the value thereof." The words quoted show the intent of the Legislature to protect the miner from the use of any device by his employer that will enable such employer to deprive the miner of the value of his labor on the basis of the quantity mined as per contract.

We see nothing in the statute under consideration that contravenes the provisions in our State and Federal constitutions securing to all persons liberty and equality of rights under the law. State Const., art. 2, § § 2, 3, 8; Fed. Const., Fourteenth Amendment.

That the law applies only to mine owner, lessee, or operator of coal mines where ten or more men are employed underground does not subject it to the interdiction of the above provisions. The coal industry of our State, on account of the great number engaged in it and dependent upon it for a livelihood, and the still greater number who are affected by it, is of vast importance. Indeed, it can be truthfully said to be an

industry of great interest to the public, if not affected by a public use. It is eminently proper that the Legislature should take supervision over it for the protection and benefit primarily of those who are engaged in it and dependent upon it, and, secondarily, for the welfare of those who are incidentally affected by it. This duty has been recognized and entered upon, as evidenced by laws intended to insure, as far as practicable, the safety, health and comfort of the miner while engaged in his hazardous employment; and also to insure him, if possible, against any fraud or imposition that might or could be practiced upon him by an unscrupulous employer, if there should be one, who would defraud him of the fruits of his toil. Kirby's Digest, § § 5337 to 5358, inclusive. Legislation of the latter class is as much warranted under the police power as the former. As the object of such legislation is to protect those miners who need protection from fraud, broad latitude must be given the Legislature in the matter of the classification of the mines and miners. The principle announced in the case of *Consolidated Coal Co.* v. *Illinois,* 185 U. S. 203, is applicable here. "In the case under consideration there is no attempt arbitrarily to select one mine for inspection, but only to assume that mines which are worked upon so small a scale as to require only five operators would not be likely to need the careful inspection provided for the larger mines, where the workings were carried on upon a large scale, or at a greater depth from the surface, and where a much larger force would be necessary for their successful operation. It is quite evident that a mine which is operated by only five men could scarcely have passed the experimental stage, or that precautions necessary in the operation of coal mines of ordinary magnitude would be required in such cases. There was clearly reasonable foundation for discrimination here."

The Supreme Court of West Virginia, in passing upon a similar clause in a similar statute, said: "The distinction drawn in favor of the smaller operators would indicate that the Legislature thought that the evils of fraud and danger of imposition did not extend to the smaller classes of operators, and hence the remedy was not extended to their employees. It is impossible to see how this distinction renders the act amenable to

the charge of violating the Fourteenth Amendment of the Federal Constitution;" citing *Budd* v. *New York,* 143 U. S. 517. See *State* v. *Peel Splint Co.,* 36 W. Va. 831. The authorities are quite numerous holding that the Legislature may make classifications and discriminations between different classes of corporations and individuals. Likewise that such laws are not open to impeachment by the courts as violative of the Fourteenth Amendment of the Federal Constitution, and the rights of civil liberty and equality, and of contract, guarantied by State and Federal constitutions, so long as equal protection is not denied to all persons similarly situated, and where it appears from the face of the act that no unreasonable, arbitrary, or unjust discrimination was intended or could be effected. Along this line see the many authorities cited in the able brief of counsel for appellee.

We do not consider the cases decided by the Supreme Court of the United States cited and relied upon in the brief of learned counsel for appellant as applicable to the statute under consideration. We believe the opinion we hold conforms to the decisions of the Supreme Court of the United States. No unjust or unreasonable discrimination against one class of persons or corporations and in favor of others can be found in this statute, as was found in the statutes in the cases cited that fell under the condemnation of the Supreme Court of the United States because repugnant to the Fourteenth Amendment of the Constitution. It must be presumed that the Legislature, through the local members from the districts affected especially by the legislation, or its committees appointed for the purpose, received information of the conditions which made such legislation necessary or expedient, and that it intended to put its enactments in the form to meet the requirements.

The act applies to "coal mines in this State, where ten or more men are employed underground." It may be fairly inferred from this language that the Legislature considered as *mines* only those places that had been developed to the extent of requiring the labor of ten or more men underground in the work of mining coal. Those places where the development work had not been carried on to the extent of requiring the labor of ten men underground were evidently regarded by the

Legislature as only in the prospective or experimental stage. We have no right to assume, from the act, that the Legislature intended to discriminate against them, but rather that they were not included because they did not need the protection afforded the class mentioned.

Similar laws have been enacted in several of the coal-producing States and, where tested, have received the sanction of the highest courts of the States, as a valid exercise of police power. Section 8786, Dig. Mo. Stat., 1899; chapter 82, Acts of W. Va., 1891; *State* v. *Peel Splint Coal Co.,* 36 W. Va. *supra;* Stat. of Kan., § § 4000-5, 1899; *State* v. *Wilson,* 61 Kan. 34; Revised Stat. of Ind., § 7840.

This court, in *Woodson* v. *State,* 69 Ark. 521, upheld a similar law as to a corporation, under the State's constitutional power to amend charter, and to prescribe conditions on which foreign corporations might continue to do business in this State. As the appellant in this case is the agent of a foreign corporation, the act could be sustained under the authority of that decision. For we do not find that the present law is so essentially different from that as to require a different ruling, and in the opinion of the court that case announces the correct doctrine.

Finding no error, the judgment is affirmed.