# JOHN PATTERSON v. STATE.

No. A-947.   Opinion Filed June 15, 1912.

(124 Pac. 942.)

1. **CONSTITUTIONAL LAW—Validity of Statute—Determination—Power of Court.** The courts cannot annul or pronounce void any act of the Legislature upon any other ground than that of repugnancy to the Constitution of the United States or of the state.

2. **SAME—Police Power.** The police power of the state extends to the protection of the lives, limbs, health, and safety of all persons, and the protection of all property within the state, and by which persons and property are subjected to all kinds of restraints and burdens in order to promote and preserve the public safety, welfare, and prosperity of the state.

3. **SAME—Mines and Minerals—Due Process of Law—Equal Protection of the Laws.** It is a proper and appropriate exercise of the police power of the state to regulate the use and enjoyment of mining properties, and mine-owners and operators are not deprived of their property, privileges, or immunities without due process of law, or 'denied the equal protection of the laws, by the provisions of article 7, c. 67, Comp. Laws 1909, prescribing general rules, regulations, and safeguards for the protection of miners.

4. **SAME—Mining Laws—Due Process of Law—Equal Protection of Law.** The provisions of the Oklahoma mining laws, classifying the mines of the state and pescribing duties, prohibitions, and penalties for any owner, operator, or mine foreman of mines in the state where ten or more men are employed therein, is a valid exercise of the police power, and not in contravention of the fourteenth amendment of the Constitution of the United States, either as an interference with the right of contract or as discriminating in favor of mines where less than ten men are employed. **St. Louis Consolidated Coal Co. v. Illinois, 185 U. S. 203, 22 Sup. Ct. 616, 46 L. Ed. 872; McLean v. Arkansas, 211 U. S. 539.**

(Syllabus by the Court.)

*Appeal from Latimer County Court;*
*Cliff V. Perry, Judge.*

John Patterson was convicted of violating the mining laws, and appeals.   Affirmed.

The plaintiff in error was convicted in the county court of Latimer county of the crime of allowing and permitting as mine foreman, miners, and employees, other than shot firers, to re-

main in the mine while shots are being fired, and was sentenced in accordance with the verdict of the jury to pay a fine of $250.

Hon. Pete Hanraty, W. K. Patterson, and Aldro Negri were the witnesses introduced by the state. Their testimony and exceptions taken thereto is set out in plaintiff in error's brief as follows:

"Pete Hanraty testified, in substance: Live at McAlester. Am chief mine inspector. Have been such since statehood. Know defendant, Patterson. Am acquainted with the mines known as Cambria, have been in them. This mine is owned by the Kali Inla Coal Company. Mr. Denman signed the records in my office for that company. The mine is No. 1. It is a slope and a coal mine. On the night of March 25, 1910, I received a telephone from somebody at Cambria that an explosion had occurred there. I suppose it was about 1 o'clock in the night. I called up Mr. Clark and we got ready and went to the mine. I went there and got the inspector of district No. 2. Mr. Clark and I got together in McAlester, and went to Haileyville, and went to this mine on the morning of March 26th. When we got there, we got ourselves and lamps ready to make the examination, and I called for the miners' committee, and none of the committee was there. Other parties, miners, went down in the mine with us. Clark and myself were along with the mine foreman, John Patterson. The defendant, John Patterson, was the mine foreman at that mine. He was in charge of the work at that time as mine foreman. He was known as such. The records of my office show that he signed his name 'John Patterson, Mine Foreman.' When we went into the slope, the slope turns around first north and then south. The entrances start about the middle of the slope. You go down from the top towards the bottom of the mine, and you find the entries. They run east and west. The one that the explosion occurred in is what I term the 'eighth east entry.' In other words, the bottom of the slope. I made an examination between 9 and 10:30 o'clock that morning. I found a trip of empty cars up the slope from the one near the eighth entry. Found empty car by the eighth entry. We went to the place where the explosion took place and examined there for gas, and then went straight across the other entry, and found some gas. We then examined things in the air course. We found dust on the walls and railing of the inside of the mine. We then went on down the slope and got to the frog, and, as there was water there, we did not go through. Examined for gas, but did not find but very little. Then turned to the entry where the explosion took place

and examined it, and found there had been two shots that caused the explosion. One I should judge was caused by too much powder. (Defendant objected, and court sustained objection.) I have worked at everything in mines, fired shots, and began a special study of explosions. I have written a book of that, which is all over the United States, and, I suppose, the world. From my experience I judge that this was a shot with too much powder, and the other one, I think, was caused probably by the dust, as the dust will sometimes catch fire and cause an explosion. When a shot explodes, it causes dust that will catch fire when there is too much powder, and that is what I think caused the second shot to explode. I found gas across from the explosion a little further up. I examined at front entries, and did not find any gas. We went down the slope, and then came back up examining and found the gas at the eighth entry. That is about all that I saw. I found that the explosion originated in the eighth entry west. I have had practical experience as a miner. Since I was nine years of age, I have worked at the mines everywhere from drive and trapper to shot firer. The 'windy shot,' as miners term it, is a shot with too much powder."

The witness was then asked to give his opinion as to where the explosion originated. The defendant objected to this, and the court overruled the objection, and an exception was saved. The witness then said:

"The explosion originated at this place in the lower part of the mine, which is called the 'eighth west entry,' and shot out of the air course. We examined all of the parts of the mine and found dust caused from the explosion, and found some fire damp. The eighth entry west is where the explosion originated on the night previous to the examination. The shots that were fired in the lower air course caused this explosion. The reasons that make me hold this opinion are that I found dust on the railing and the top had dust on it. If the explosion had not occurred there, there would not have been such condition of the mine. I made a test as required by law. I have the same in my records in my office. I always carry my safety lamp, and I test for the gas with that. I found the gas in the eighth west entry where the explosion originated."

When asked if he examined the slope, the witness said:

"It was in the shape that windy shots leave a place when they hit it. There was a good deal of dust up the trip of cars. and looked as though it had went up the slope a little ways. Did

not find any gas anywhere else to amount to anything. When I went out to wash up, the defendant was with me."

There was no cross-examination of said witness, and the above was all of his evidence.

The state then introduced W. K. Patterson. This witness testified as follows:

"I live at Coalgate. Am district mine inspector. Know defendant, Patterson. Have visited the mine of the Kali Inla Coal Company several times. Visited this mine on March 23 and on March 25, 1910. On March 23d there were 109 miners, and 21 men who were working on top, according to Patterson's figures. Mr. Patterson was mine foreman at the time I was there on March 23d. I went down the main way, and then down to the eighth east entry, and so did John Patterson. We went through this entry. I did not go through the eighth west. Mr. Patterson failed to take me there. My next trip was on the morning of March 28th. I examined these two entries at that time. I found some little gas, and it was 37 feet of the air course, and it was 87 feet. This was 50 feet more than the law required. I have had 42 years experience as a miner. Have done most all kinds of work. Have never filled the position of shot firer."

The said witness was then asked the extent of his experience as to studying the explosions in mines. The defendant objected. The court overruled the objection. The defendant excepted. The witness then continued:

"In some mines in firing the shots, the shot firer will not tamp the shot enough, and if it has enough powder, and when the fuse is lighted and the fire reaches the powder, it will cause a windy shot, and the dust caused from this will ignite and cause an explosion when it does this. My opinion on the matter is that the shots had not been tamped enough, and that they exploded and went towards the air course. (This statement was objected to and exception saved.) You can tell the effects of the explosion by the way things were in the air course and slope. I examined for gas, and found some in the front of the eighth east entry. I understand that the instrument of writing handed to me is a report sent to my office from Mr. Patterson. It is the original report that came to our office. The report is as follows: 'Report of Accident. On Friday, March 25th, at about 9:30 p.m., four men were fatally injured in mine No. 1 (Slope) operated by Bache & Denman at Cambria, Okla., to wit Louis d'Alpo, a miner, age 28, married, wife and one baby. Via

Aneciton, miner, age 28, single. Andrew Hanshinelli, miner, age 20, single. Petrod Farnetti, rope rider, age 21, single. An explosion of some kind occurred in the mine, and on investigation an Italian claims that he found three men six feet below the trip, and that he put them in the car. There were about  cars on the trip, and the bodies were placed in the lower car.  The rope rider was found about 100 feet below the eighth east entry, all were dead. The miners were all working together, two in one entry and one in the other entry. They were driving the eighth east air course and entry. There was only these four men in the mine. The entry was in about 120 feet from the switch. Statment made by John Patterson, mine foreman, March 28, 1910.' I had no conversation with John Patterson, the defendant, on March 23d with reference to men remaining in the mine while shots were being fired. I did have a conversation with him on March 26th. (The defendant objected to this testimony. Objection overruled and exception saved.)   I asked John Patterson if any men stayed in the mine, and he said yes. I asked him who fired the shots, and he said the men fired their own shots. That is, these men that were killed. I also asked him if there was any fire boss, and he said no. I asked him if the men remained in the main when shots were being fired, and he said they fired their own shots and fired when they got ready to fire."

On cross-examination the said witness said:

"Part of this conversation occurred in the mine nad part of it in the washing room on top of the mine where I was washing. John Patterson said in that conversation that he did not know that the men were in the mine. He did not tell me that the men were not to go in the mine on that night. He said that some entry was out of order, and that he had ordered the work stopped. He did tell me that he did not know that the men were there on that night. I was not there at the time of the explosion. All the information I had I got from the investigation, and from what others told me. I got the information from Mr. Patterson that this was in the nighttime—the night shift. That work was at night. The entry was driven only at night I suppose. Mr. Patterson told me that these four men were the only ones in the mine at the time of the explosion. I don't know whether the four men were the total or not. I do not know whether the 109 and 21 men were all that worked there. These four were all that were supposed to be in the mine that night. Mr. Patterson also stated that the fire runner was in there

running fire and the other men were working that made five in all."

The above was all the testimony of said witness. The state then introduced Aldro Negri, who testified through an interpreter. He testified as follows:

"I live at Cambria. Know defendant, Patterson. I was digging coal at Cambria last March. I was fire runner on March 24th and March 25th. I was working then for another fellow who was the regular fire runner. I recall the night that the explosion occurred. I was between the sixth east and sixth west and on the slope. I was in the mine at the time the explosion occurred. The others in the mine were Louis d'Alposs, Via Anexiton, Andrew Gashinelli, and Pedtre Farnetti. Farnetti was rope rider. The others were digging coal. They were turning the entry. The eighth west entry. I was in the eighth east, and met these fellows. First I knew of the explosion I heard a big noise and wind, and then knocked me down. By 'big wind' I mean explosion. I saw rope rider with the other fellows at time of explosion. I saw all of them near the eighth east and eighth west entry. These men that were killed were about 10 feet from the car. This refers to the three men that were working in the entry. I did not see the rope rider. I heard the wind, and then in three seconds I was knocked down. I do not understand English. As soon as I got up, I went out and got my friends, and we came back, and got the men. At time of explosion I was coming up the slope. I was near the seventh west entry. I was there looking for fire. I was in the place of the other fellow. At the time I met these men, they were going down the slope towards the eighth east entry. I met them about 10 minutes before the explosion. After I met them, I went up to the seventh east entry. I went in the seventh east entry to the face of the entry. That was about 600 feet. It is about 300 feet from the seventh east entry to the sixth east entry. Explosion occurred when I was a little on the top of the sixth east entry. The explosion knocked me out against the sixth east. Ten minutes before that I saw the men going down. I knew them then. After explosion I called the other fellows, and then I had to come out on account of bad smoke. I did not find the men then. I went down three times. The bodies were near the entry close to the slope between the slope and the entry. I did not see them work. Found two of the men on top of the rail and one on bottom of rail. Did not see the rope rider. I went into the mine on that night before these men. I had been run-

ning fire four nights. Three of these men had been working over nights. (Defendant saved an exception to the introduction of that evidence.) One of the men had not worked any other night. Between the eighth east and eighth west it is about 150 feet. When I met these men going down before the explosion, they all had miners' lamps on. Miners' lights."

The witness was asked if they were safeties, and he said, "Just miners' lamps."

The above was all of the evidence in the case. The defendant offered no evidence.

*Jones & Lester* and *Read & McDonough*, for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson and E. G. Spillman,* Asst. Attys. Gen., for the State.

DOYLE, J. The information charges a violation of the provisions of article 2, c. 54, of the Mining Laws (act approved April 6, 1908).

The information, omitting the formal parts, is as follows:

"In the name and by the authority of the state of Oklahoma. Now comes W. P. McGinnis, the duly qualified and acting county attorney, in and for Latimer county, state of Oklahoma, and gives the county court of Latimer county, state of Oklahoma, to know and be informed, that John Patterson did, in Latimer county, and in the state of Oklahoma, on or about the 25th day of March in the year of our Lord, one thousand nine hundred and ten and anterior to the presentment hereof, commit the crime of allowing and permitting miners and employees other than shot firers to be and remain in the mines while shots are being fired in the manner and form as follows, to wit: That said defendant, John Patterson, being then and there mine foreman of the Kali Inla Coal Company at its mine No. 1 at Cambria, in Latimer county, Okla., and as such mine foreman being then and there the officer and agent of the said Kali Inla Coal Company in charge of its mine No. 1 as aforesaid in said county and state aforesaid, did on the date aforesaid, and in the county and state aforesaid unlawfully and wrongfully allow and permit Via Aneciton, Andrew Gehinetti, and Louis D. Alposs, they being then and there miners and employes other than shot firers of the Kali Inla Coal Company, at its mine No. 1 at Cambria, in said county and state aforesaid, to be and remain in said mine

No. 1 aforesaid at the time of the firing of shots therein, and they, the said Via Aneciton, Andrew Gehinetti, and Louis D. Alposs, not being then and there the regularly and duly employed shot firers of the said Kali Inla Coal Company at its mine No. 1 at Cambria in said county and state aforesaid, and the said mine No. 1 of the Kali Inla Coal Company at Cambria in said county and state, being then and there a coal mine employing ten and more miners to work therein, contrary," etc.

The defendant filed a demurrer thereto, which was overruled by the court and exception allowed.

The questions presented require a consideration of the following sections of article 7, c. 67, Comp. Laws, 1909, entitled: "General rules, regulations and safeguards for the protection of miners": Section 4381, Comp. Laws 1909:

"The operator shall employ a competent and practical inside overseer for each and every mine employing ten or more persons inside, to. be called mine foreman (who shall have charge of the inside operations of the mine), and shall see that the provisions of this. act are strictly enforced. * * *"

Section 4394:

"Rule 1. The mine foreman shall attend personally to his duties in the mine and carry out all the instructions set forth in this act, and see that the regulations prescribed for each class of workmen under his charge are carried out in the strictest manner possible, and see that any deviations from or infringements of any of them are promptly adjusted.* * * Rule 6. He shall, on blank forms provided by the chief mine inspector for the purpose, within ten days after their occurrence, report to the. mine inspector, all fatal and serious accidents occurring in or about the mines, giving age, nationality, and occupation of the injured persons, together with the facts as to the families or dependants, affected, et cetera, but he shall, as hereinbefore provided, give immediate notice of all fatal accidents."

Section 4395:

"All owners, lessees, operators or any other persons having the control and management of any coal shaft, drift. slope or pit in this state, employing ten or more miners to work therein shall employ shot firers at operator's expense, to fire the shots therein. Said shots shall be fired at the end of each shift, but not until all miners and other employees. working therein, are out of said mine."

Section 4398:

"No shot firers shall enter any mine, for the purpose of firing shots, nor shall any shots be fired until all employees shall have left the mines.    *    *    *"

Section 4401:

"The neglect, failure or refusal to perform any of the duties required by any section of this act, by any firm, association, corporation, person or parties required to perform them, shall be a misdemeanor, and where the duty so neglected, failed or refused to be performed is by the terms of this act required of a corporation, then its officer or agent in charge of the mine, shall be guilty, as hereinbefore provided for in this section, and, except as herein otherwise provided, shall upon convection thereof, be punished by a fine of not exceeding five hundred dollars, or imprisonment in the county jail, for a period not exceeding six months, or both such fine and imprisonment.   Provided, that nothing in this act shall be construed so as to relieve any person, firm, company or corporation from liability or damages in a civil action."

The first contention of counsel for plaintiff in error is that the information is fatally defective, in that it does not state facts sufficient to constitute an offense under the statute, "because it is not alleged that the duty which is alleged to be violated was under the terms of the act required of a corporation." This allegation is not necessary, because it is specifically alleged that the defendant John Patterson was then and there acting as mine foreman of the Kali Inla Coal Company then and there in charge of the mine, and the neglected duty unperformed is specifically made a part of the mine foreman's duties by section 4394, *supra.* The penalty section (4401, *supra*) is very broad and comprehensive in its terms, including all sections of the act, and provides punishment for any firm, association, corporation, person, or parties required to perform them.   The law is that in all mines in this state where ten or more persons are employed to work therein the duty is imperative to employ shot firers to fire all shots therein when all other employees are out of the mine. The contention is destitute of merit, and the demurrer was properly overruled.

The principal contention of counsel for plaintiff in error is that the mining act in question is unconstitutional and void, and

in violation of the fourteenth amendment of the Constitution of the United States.

The party who wishes to pronounce a law unconstitutional takes upon himself the burden of proving beyond all doubt that it is so. Every legislative act is presumed to be constitutional, and the courts should not declare an act to be unconstitutional unless it is clearly so.                                                    n

The police powers of a state extend to the protection of the lives, limbs, and health of all persons, and the protection of all property, within the state, and by which persons and property are subjected to all kinds of restraints and burdens for the protection of life, person and property, in order to secure the general comfort, health, and prosperity of the state.

There can be no question that this legislation is a proper and appropriate exercise of the police power. The plain purpose of the act is to protect, so far as legislative enactments may, the lives and persons of the men employed in the mines of this state while they are in the mines. The mining of coal is unquestionably dangerous and hazardous work, and in this state it is a productive industry of vast importance. Thousands of men are engaged in that character of work, and a proper safeguard of their lives and health is a matter of humane necessity. No subject can be mentioned where there is a more positive necessity for the exercise of the police power than in seeking to subserve their safety. This duty has been recognized and entered upon as evidenced by our mining laws, intended to insure, as far as practicable, the safety and health of the miner while engaged in his dangerous and hazardous occupation.

The question as to whether the act in so far as it discriminates as to operators of coal mines is a proper exercise of the police power is passed upon in the case of *St. Louis Consolidated Coal Co v. Illinois*, 185 U. S. 203, 22 Sup. Ct. 616, 46 L. Ed. 872, and the principle announced is directly applicable. Speaking of a similar provision of the mining laws of Illinois, the Supreme Court of the United States says:

"This is a species of classification which the Legislature is at liberty to adopt, provided it be not wholly arbitrary or unreas-

onable, as it was in *Cotting v. Kansas City Stockyards Company*, 183 U. S. 79 [22 Sup. Ct. 30, 46 L. Ed. 92], in which an act defining what should constitute public stockyards, and regulating all charges connected therewith, was held to be unconstitutional, because it aplied only to one particular company, and not to other companies or corporations engaged in a like business in Kansas and thereby denied to that company the equal protection of the laws. In the case under consideration there is no attempt arbitrarily to select one mine for inspection, but only to assume that mines, which are worked upon so small a scale as to require only five operatives, would not be likely to need the careful inspection provided for the larger mines, where the workings were carried on upon a larger scale or at a greater depth from the surface, and where a much larger force would be necessary for their successful operation. It is quite evident that a mine which is operated by only five men could scarcely have passed the experimental stage, or that precautions necessary in the operation of coal mines of ordinary magnitude would be required in such cases. There was clearly reasonable foundation for a discrimination here."

In the case of *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 31 Supt. Ct. 337, 55 L. Ed. 369, it was held that the equal protection clause of the fourteenth amendment admits of a wide exercise of discretion, and only avoids a classification which is purely arbitrary, being without reasonable basis; nor does a classification having some reasonable basis offend because not made with mathematical nicety or resulting in some inequality. See, also, *Wilmington Star Mining Co. v. Fulton*, 205 U. S. 60, 27 Sup. Ct. 412, 51 L. Ed. 708. In the case of *McLean v. State*, 81 Ark. 304, 98 S. W. 729, 126 Am. St. Rep. 1037, 11 Ann. Cas. 72, the Supreme Court of Arkansas, construing a statute containing a similar classification, said:

"The act applies to 'coal mines in this state, where ten or more men are employed underground.' It may be fairly inferred from this language that the Legislature considered as mines only those places that had been developed to the extent of requiring the labor of ten or more men underground in the work of mining coal. Those places where the development work had not been carried on to the extent of requiring the labor of ten men underground were evidently regarded by the Legislature as only in the prospective or experimental stage. We have no right to assume from the act that the Legislature intended to discriminate

against them, but rather that they were not included because they did not need the protection afforded the class mentioned. Similar laws have been enacted in several of the coal producing states, and, where tested, have received the sanction of the highest courts of the state, as a valid exercise of police power. *State v. Peep Splint Coal Co.*, 36 W. Va. 802, 15 S. E. 1000 [17 L. R. A. 385]; *State v. Wilson*, 61 Kan. 34, 58 Pac. 981 [47 L. R. A. 71]."

On appeal to the United States Supreme Court to reverse the judgment of the Supreme Court of Arkansas the judgment was affirmed. *McLean v. Arkansas*, 211 U. S. 539.

We are clearly of opinion that there is nothing in the statutes under consideration that is in contravention of the fourteenth amendment to the Constitution of the United States.

The evidence of the defendant's guilt is undisputed. None of the other alleged errors committed by the court in giving and refusing instructions, or in passing upon the admissibility of evidence, are tenable, and they do not require special notice.

Finding no error, the judgment appealed from is hereby affirmed.

FURMAN, P. J., and ARMSTRONG, J., concur.