# ST. LOUIS CONSOLIDATED COAL COMPANY *v.* ILLINOIS.

## ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 197. Submitted March 19, 1902.—Decided April 14, 1902.

It is within the power of a state legislature to provide for the appointment of inspectors of mines and the payment of their fees by the owners of the mines.

A law providing for the inspection of coal mines is not unconstitutional by reason of its limitation to mines where more than five men are employed at any one time.

Where the law provided for an inspection of coal mines at least four times a year, it was held not to be objectionable by reason of the fact that a discretion was invested in the inspectors to cause the mines to be inspected more than four times a year, and as often as they might deem it necessary and proper.

A law providing that the fees for each inspection shall not be less than six nor more than ten dollars is not rendered unconstitutional by the fact that, within these limits, the fees for each inspection are fixed by the inspector.

THIS was an action of assumpsit originally brought in the Circuit Court of St. Clair County by the people of the State of Illinois against the Consolidated Coal Company of St. Louis, a corporation of Illinois, to recover the sum of $1818 for the fees of state mine inspectors for the inspection of certain coal mines located in Illinois, owned and operated by the defendant under "An act providing for the health and safety of persons employed in coal mines," originally enacted May 28, 1879, and the amendments thereto.

The case was submitted to the court without a jury upon a stipulation of facts, in which it was agreed that the mines of the defendant, thirty-one in number, had been inspected between November 2, 1895, and June 26, 1899, by a state inspector, whole aggregate fees were $1818; that the Secretary of the Bureau of Labor Statistics presented the defendant with the inspection bills and demanded payment therefor, which defendant refused to pay.

It was further stipulated that the charge for the recovery of which this action was brought was made in pursuance of the act of May 28, 1879, and that the question to be raised and disposed of was the validity and constitutionality of so much of said above entitled act and the amendments thereto, as related to the inspection fees of the said mine inspectors, and the imposing upon the mine operator and owner the duty of paying such fees, and also whether there was any remedy at law to recover such fees.

A judgment having been entered for the payment of these fees the case was carried by writ of error to the Supreme Court, where the judgment of the Circuit Court of St. Clair County was affirmed.

*Mr. Charles W. Thomas* for plaintiff in error.

*Mr. Howland J. Hamlin* for defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

The act of the general assembly of the State of Illinois, entitled an act to provide for the health and safety of persons employed in coal mines, originally passed May 28, 1879, subsequently incorporated in the Revised Statutes of 1895, and amended in 1897, Hurd's Statutes, 1897, p. 1088, c. 93, provides as printed in the margin.[1]

---

[1] "SEC. 11 *a*. This State shall be divided into seven inspection districts, as follows: " etc.

"SEC. 11 *b*. *The Governor shall*, upon the recommendation of a board of examiners selected for that purpose, composed of two practical coal miners, two coal operators, and one mining engineer, to be appointed by the Bureau of Labor Statistics of this State, all of whom shall be sworn to a faithful discharge of their duties, *appoint seven properly qualified persons to fill the offices of inspectors of coal mines of this State* (being one inspector for each district, provided for in this act), whose commissions shall be for the term of two years, but they shall at all times be subject to removal from office, for neglect of duty or malfeasance in the discharge of duty, as hereinafter provided for.

"SEC. 11 *c*. The inspectors so appointed shall have attained the age of thirty years, be citizens of this state, and have a knowledge of mining en-

The Supreme Court found that all the state questions involved in this case had been disposed of in *Chicago, Wilmington*

gineering sufficient to conduct the development of coal mines, and a practical knowledge of the methods of conducting mining for coal in the presence of explosive gases, and of the proper ventilation of coal mines. They shall have had a practical mining experience of ten years, and shall not be interested as owner, operator, stockholder, superintendent or mining engineer of any coal mine during their term of office, and shall be of good moral character and temperate habits, and shall not be guilty of any act tending to the injury of miners or operators of mines during their term of office. They shall provide themselves with the most approved modern instruments for carrying out the intention of this act," etc.

"Sec. 11*d.* Any person, company or corporation operating any coal mine in this State *shall be required to pay an inspection fee of not less than six dollars nor more than ten dollars for each visit of inspection or investigation of a coal mine by a state mine inspector, such fee to be regulated by the class of the mine, which shall be fixed by the inspector and depend upon the length of time consumed, and the expense necessarily incurred in the inspection of such mine,* and such fees shall be paid quarterly by the person, company or corporation operating the mine inspected to the Secretary of the Bureau of Labor Statistics and by him covered into the state treasury to be held as a fund for the payment of salaries of state Mine Inspectors, as herein provided. *It shall be the duty of each inspector, as often as he may deem it necessary and proper, and at least four times a year, to inspect each and every mine in his inspection district.* Each inspection shall be certified to by the pit committee and mine manager of said mine. It shall be the duty of each inspector to keep a detailed record of all inspections and of all fees for such inspections, and he shall file a copy of the same with the Secretary of the state Bureau of Labor Statistics quarterly, between the first and fifteenth days of the following months: October, January, April and July, which reports shall be published annually as a part of the regular report of the state Bureau of Labor Statistics. The inspectors provided for in this act shall receive as full compensation for their services the sum of eighteen hundred dollars each per annum, to be paid quarterly out of such funds in the state treasury as may be received for inspection fees: *Provided, however,* That in the event of such fees being inadequate to compensate the inspectors in the amount provided herein, the deficiency in the salaries shall be paid out of any moneys in the state treasury not otherwise appropriated. The mine inspector shall be required to post up in some conspicuous place at the top of each mine visited and inspected by him, a plain statement of the condition of said mine, showing what in his judgment is necessary for the better protection of the lives and health of persons employed in said mine; such statement shall give the date of inspection and the number of hours spent in the inspection, also the date of the latest previous inspection, and shall be signed by the inspector and the

& *Vermilion &c. Coal Co.* v. *The People,* 181 Ill. 270.    It only
remains for us to determine whether the validity of the state
statute above cited was drawn in question on the ground of its
repugnancy to the Constitution and laws of the United States,
and the decision was in favor of its validity, when it should
have been held invalid.    While the constitutionality of the law
was not specially set up and claimed before the trial in the Cir-
cuit Court, there was a motion made in arrest of judgment, in
which the invalidity of the statute was specially set up upon
the ground of its repugnancy to the Fourteenth Amendment to
the Constitution.    The motion was denied, although the Su-

---

check weighman, and, if there be no check weighman, employed by the
miners, then said statement shall be signed by the weighman at the mine.

"SEC. 11*e*. It shall be unlawful for any person, *company or corporation*
to operate any coal mine in this State without first having complied with
all the conditions and sanitary regulations required under existing laws
and paying all inspection fees provided for in this section; and in case of
the refusal of any person, company, corporation, owner, agent or operator
to pay said inspection fees, after assuming to operate a coal mine, it shall
be the duty of the mine inspector in said district, through the State's at-
torney of the county, or any other attorney, in case of his refusal promptly
to act, to proceed on behalf of the State against said person, company, cor-
poration, owner, agent or operator of said mine, by injunction, without
bond, to restrain said person, company, corporation, owner, agent or op-
erator from continuing or attempting to continue to operate said mine or
carry on a mining business."

In 1897 section 11*e* was amended so as to read as follows, the words in
italics being inserted into the paragraph as it was originally enacted (Ses-
sion Laws, 1897, p. 269):

"SEC. 11*e*. It shall be unlawful for any person, company or corporation
to operate any coal mine in this State, *where more than five men are em-
ployed at any one time*, without first having complied with all the condi-
tions and sanitary regulations required under existing laws, and paying all
inspection fees provided for in this section, and in case of the refusal of
any person, company, corporation, owner, agent or operator to pay said
inspection fees, after assuming to operate a coal mine, it shall be the duty
of the mine inspector in said district, through the State's attorney of the
county, or any other attorney, in case of his refusal to promptly act, to
proceed on behalf of the State against said person, company, corporation,
owner, agent or operator of said mine by injunction, without bond, to re-
strain said person, company, corporation, owner, agent or operator from
continuing or attempting to continue, to operate said mine or carry on a
mining business."

preme Court did not in terms pass upon the Federal constitutionality of the law. But this was a sufficient presentation of the Federal question.

The regulation of mines and miners, their hours of labor, and the precautions that shall be taken to ensure their safety, health and comfort, are so obviously within the police power of the several States, that no citation of authorities is necessary to vindicate the general principle. Many of these cases are reviewed in *Holden* v. *Hardy,* 169 U. S. 366, in which it was held to be competent for a state legislature to limit the hours of labor, in mines and smelting works, to eight per day.

1. We do not understand the general principle to be questioned that the State may appoint mining inspectors, and provide for their payment by the owners of mines, *Packet Co.* v. *St. Louis,* 100 U. S. 423 ; *Morgan* v. *Louisiana,* 118 U. S. 455 ; *Nashville &c. Railway* v. *Alabama,* 128 U. S. 96, 121 ; *County of Mobile* v. *Kimball,* 102 U. S. 691 ; *Charlotte &c. R. R.* v. *Gibbes,* 142 U. S. 386 ; *Chicago &c. Coal Company* v. *People,* 181 Ill. 270 ; but it is insisted that the acts here involved, in so far as they give to district mining inspectors, a discretion as to the number of times they shall inspect such mines, and a further discrimination as to what fees they shall charge, within the limit fixed by these acts, is in contravention of the Fourteenth Amendment, forbidding a State from depriving any person of life, liberty or property without due process of law, or denying any person within its jurisdiction the equal protection of the law.

2. Another question is whether the act, as amended in 1897, in so far as it discriminates as to penalties imposed upon some persons engaged in the mining business, and not upon others, is a proper exercise of the police power. It is true that the act of 1897 amended the former law of 1895, by limiting its application to coal mines " where more than five men are employed at any one time." This is a species of classification which the legislature is at liberty to adopt, provided it be not wholly arbitrary or unreasonable, as it was in *Cotting* v. *Kansas City Stock Yards Company,* 183 U. S. 79, in which an act defining what should constitute public stock yards and regulat-

ing all charges connected therewith was held to be unconstitutional, because it applied only to one particular company, and not to other companies or corporations engaged in a like business in Kansas, and thereby denied to that company the equal protection of the laws. In the case under consideration there is no attempt arbitrarily to select one mine for inspection, but only to assume that mines, which are worked upon so small a scale as to require only five operatives, would not be likely to need the careful inspection provided for the larger mines, where the workings were carried on upon a larger scale or at a greater depth from the surface, and where a much larger force would be necessary for their successful operation. It is quite evident that a mine which is operated by only five men could scarcely have passed the experimental stage, or that precautions necessary in the operation of coal mines of ordinary magnitude would be required in such cases. There was clearly reasonable foundation for a discrimination here.

It is true that the act of 1897 does not in terms declare that the act of 1895 shall only apply to coal mines where more than five men are employed at any one time, but merely exempts the owners of such mines from punishment for violations of the general law. No one, however, can read this act, in connection with the prior act of 1895, without perceiving an intention on the part of the legislature to exempt such mines from the scope of the act. An act which declares it to be unlawful for any person to operate mines *of a certain class* without first complying with all the conditions and sanitary regulations required under existing laws, and paying all inspection fees, and, in case of refusal, to make it the duty of the mine inspector, through the State's attorney, to proceed in behalf of the State against such person, to compel the discontinuance of the mine, is so plainly an exemption from the operation of the law of all *other* mines as to constitute a classification in their favor.

3. Another charge is that by section 11 *d*, " it shall be the duty of each inspector, as often *as he may deem it necessary and proper*, and at least four times a year, to inspect each and every mine in his inspection district." It requires no argument to show that, for the protection of the operatives, one mine may be

required to be inspected oftener than another, depending largely upon the number of miners, the depths of their workings and the nature of the ground through which the excavations are made. While at a certain stage of excavation the precautions imposed by the mining inspector may be quite adequate for the protection of the operatives, at another time the same precautions would be obviously insufficient, depending largely upon the rapidity with which the excavations were made and the changes of air observed as the excavations progressed.

It is true that the act itself furnishes no basis for a classification as to the number of inspections and as to the price charged in each case, except that it provides that no inspection shall be required, unless five operatives are employed at the same time, that at least four inspections shall be made each year, and that the fees shall be dependent upon the length of time consumed, and the expense necessarily incurred in the inspection of such mine. It also provides that the charges for each inspection shall not be less than six nor more than ten dollars.

It is insisted that such classification of mines, as to the number of inspections and fees therefor, should be made by the legislature, and nothing be left to the inspectors or other officers to determine the number of times a particular mine shall be inspected and the fees chargeable therefor. The ordinary classification is made by the legislature, where such classification can be logically made, either upon the basis of capital stock, number of operatives, mileage, or other facts which can be seized upon as an easy and an approximately just basis for classification. But in such a case as this there are so many elements entering into the classification as to make it impossible to seize upon one or two, and make them the only basis. For instance, the number of inspections to be made might depend not only upon the size of the mines, and the number of the operatives, but upon the character of the work being done, the nature of the soil being excavated, the depth of the excavation and a dozen other features, all of which might enter into the basis of a classification by a competent inspector, and no one of which can be said to be determinative.

We do not regard the act as necessarily violative of the Four-

teenth Amendment, in the fact that some discretion is allowed to the inspector in determining the number of times the mines shall be inspected, and the fees fixed therefor, particularly in view of the fact that no complaint is made of the abuse of such discretion, or that the inspector has been " guilty of any act tending to the injury of miners or operators of mines during their term of office." Sec. 11 c.

While it is undoubtedly true that legislative power cannot be delegated to the courts or to the executive, there are some exceptions to the rule under which it is held that Congress may leave to the President the power of determining the time when or exigency upon the happening of which a certain act shall take effect. Thus in the leading case of *The Aurora*, 7 Cranch, 382, it was held that Congress might make the revival of a law conditional upon a fact then contingent, and empower the President to declare by proclamation that such fact has occurred and the law revived. It has also been the immemorable policy in this country and in England to vest in municipal organizations certain local powers in respect to which they are peculiarly interested, and of the necessities of which they are much better informed than a general legislature possibly could be. Other instances are cited by Judge Cooley in his work upon Constitutional Limitations: " For the like reasons the question whether a county or a township shall be divided and a new one formed, or two townships or school districts, formerly one, be reunited, or a county seat be located at a particular place, or after its location removed elsewhere, or the municipality contract particular duties, or engage in a particular improvement, is always a question which may be with propriety referred to the voters of the municipality for decision."

The last case in this court in which the question arose, is that of *Field* v. *Clark*, 143 U. S. 649, in which it was held that while Congress could not under the Constitution delegate its legislative power to the President, it might authorize him to suspend, by proclamation, the free introduction of sugar, coffee and similar articles, when he was satisfied that any country producing such articles imposed duties, or other exactions, upon the prod-

ucts of the United States which he might deem to be reciprocally unequal or unreasonable.

In enacting a law with regard to the inspection of mines, we see no objection, in case the legislature find it impracticable to classify the mines for the purposes of inspection, to commit that power to a body of experts who are not only experienced in the operation of mines, but are acquainted with the details necessary to be known to make a reasonable classification, although it may affect the amount of fees to be paid by the mine owners.

It is obviously necessary that the number of inspections per year shall be determined by some one and by some executive officer. As it is clearly a matter of detail which could not be determined by the courts, it occurs to us that it could be entrusted to no one so safely as to the inspector of the district, who is appointed with great care, and who must be thirty years of age, a citizen of the State, and have a knowledge of mining engineering sufficient to conduct the development of coal mines and a practical knowledge of the method of conducting the mining for coal in the presence of explosive gases and of the ventilation of coal mines. Each one must have a practical mining experience of ten years, not interested as owner, operator, stockholder, superintendent or mining engineer of any coal mine during his term of office, and be of good moral character and temperate habits.

The stipulation upon which the case was tried shows that the defendants were the owners of thirty-one mines, and that they were inspected between November 22, 1895, and June 26, 1899, two hundred and forty times, which was at the rate of about seventy-eight times per year for all of the thirty-one mines, or about two and one half times per year for each mine. As section 11 *d* of the act requires each inspector to inspect each and every mine in his district at least four times a year, it would seem that instead of overdoing his duty, he had been derelict in the performance of it.

4. It is also true that the fees for each inspection shall not be less than six dollars nor more than ten dollars, and that such fees shall be regulated by the class of the mine, which shall be fixed by the inspector and depend upon the length of time con-

sümed and the expense necessarily incurred in the inspection of such mine. Objection is made upon the ground that it gives to each mining inspector not only the right to determine the number of times each mine shall be inspected, but the fees to be charged in each case. If his discretion were unlimited in this direction, and the fees were retained by himself, there would be much force in the suggestion; but the truth is that the amount of the fee must be in each case somewhere between six dollars and ten dollars, and must be paid to the Secretary of the Bureau of Labor Statistics, and by him covered into the State treasury, to be held as a fund for the payment of the salaries of the mining inspectors. Each inspector provided for by the act receives for his services $1800 per annum, to be paid quarterly out of the funds in the state treasury received for the inspection fees, and in the event of such fees being inadequate to compensate such inspectors in the amount provided for herein, the deficiency of the salaries shall be paid out of the money in the state treasury not otherwise appropriated. It appears, then, *first*, that the state inspector receives a regular salary, neither increased nor diminished by the number of inspections or the amount paid for each inspection; and, *second*, that he receives such salary directly from the Bureau of Labor Statistics and not from the fees paid to him therefor. As his compensation is dependent neither upon the number of his visits nor upon the amount of his fees, it is difficult to see how he would gain by multiplying one or magnifying the other. We know of no reason why the legislature should deprive itself of the best attainable evidence of the facts it seeks to make determinative of these two questions.

As we fail to discover any repugnancy between the acts in question and the Fourteenth Amendment to the Constitution, we are of opinion that the decree of the Supreme Court was right, and should be

*Affirmed.*