Summers, J.
These cases present questions as to the validity of Sections 2916, 2917, 2918, 2919, 2921 and 2921a, Revised Statutes of Ohio, as amended April 23, 1904 (97 O. L., 439), and Section 2919-1, Revised Statutes, as amended April 23, 1904 (97 O. L., 107), and the regularity and validity of certain proceedings had by the Republican county central committee of Franklin county and the Republican county central committee of Allen county. It is contended that these sections conflict with many provisions of the state constitution and with the fourteenth amendment to the constitution of the United States. The several constitutional provisions which it is contended are violated will be indicated as the several objections are noticed. It is not necessary to set out in full these sections of the statutes. Their purport is sufficiently indicated by the statement that they constitute in a large measure what is known as the primary election law, and that they were designed to protect the elections of voluntary political associations and to punish frauds therein. They provide, in brief, that when any voluntary political association or party in any county, township, or municipal corporation, by its controlling committee gives notice of the holding of a primary election for the selection of party candidates, committeemen, delegates or alternates to any party convention and makes application therefor to the deputy state supervisor of elections or board of deputy state supervisors and inspectors of elections, as the case may be, of such county, such primary election shall be held and conducted under the supervision of such officers. These officers *569 provide ballots, poll books, tally sheets, and other necessary things, and assign to each polling place two competent electors to act as judges and one competent elector to act as clerk, and the expenses are paid out of the public funds. It is made unlawful for any person who is not a member of the party to vote at such election or to vote at any other than the polling place in the precinct, ward, or township wherein he resides. In brief, the purpose is to permit only those who are members of the party to participate in the election and to have the result honestly ascertained and declared.
The national and state governments in the manner of their operation are quite different from what was contemplated in their organization. Political parties were not thought of, but so potent have they become in determining the measures and in administering the affairs of government that they are regarded as inseparable from, if not essential to, a republican form of government. In his “The American Commonwealth,” Mr. Bryce says: “In America the great moving forces are the parties * * *. The spirit and force of party has in America been as essential to the action of the machinery of government as steam is to a locomotive engine; or, to vary the simile, party association and organization are to the organs of government almost what the motor nerves are to the muscles, sinews, and bones of the human body. They transmit the motive power, they determine the directions in which the organs act. A description of them is therefore a necessary complement to. an account of the constitution and government; for it is into the hands of the parties *570 that the working of the government- has fallen. Their ingenuity, stimulated by incessant rivalry, has turned many provisions of the constitution to unforeseen uses, and given to the legal institutions of the country no small part of their present colour.”
Sir Henry Sumner Maine says: “It is not to be expected that all the hopes of the founders of the American constitution would be fulfilled. They do not seem to have been prepared for the rapid development of party, chiefly under the influence of Thomas Jefferson, nor for the thorough organization with which the American parties before long provided themselves.”
And. again he says: “The truth is, that the inherent difficulties of democratic government are so manifold and enormous that, in large and complex modern society, it could neither last nor work if it were not aided by certain forces which are not exclusively associated with it, but of which it greatly stimulates the energy. Of these forces, the one to which it owes most is unquestionably Party.”
The elector’s choice of persons for office, to be effective, must be from party candidates, and so the nomination of candidates becomes as much a matter of public concern as the election of officers. The public welfare is directly involved in the selection of candidates, and the manner of selection is subject to regulation under the police power. Whether the state should undertake the regulation of the matter is not pertinent to the present inquiry. Most writers upon the subject agree that regulation is desirable, and differ only as to its extent. Some contend that it should be limited to *571 requiring all nominations to be made in a convention of delegates elected at primaries regulated by the state; others, that all candidates for office should be elected at primary elections.
Regulation by the state being authorized on the ground that the public welfare is involved, it follows necessarily that appropriations of the public revenue to meet the expense of executing the regulations are for a public purpose, and the power of taxation is not drawn in question.
It is contended that these statutes conflict with Section 2 of Article I of the constitution and with the fourteenth amendment to the federal constitution, for the reason that only political parties, casting at least ten per cent, of the vote cast at the last general election, may avail themselves of these provisions, and that therefore the equal protection and benefit of the law is denied to those who do not belong to such or any of the parties; and that they are in conflict with Section 26 of Article II, which provides that all laws of a general nature shall have a uniform operation throughout the state. The purpose of the legislation is to promote the public welfare by preventing fraud in the nomination of candidates for office, and it is not vulnerable on the ground merely that it is not broad enough and will not cut off every abuse and make fraud impossible. This section of the Bill of Rights does not declare that every man shall receive the same amount of protection and benefit, but that “government is instituted for their (the people’s) equal protection and benefit.” Equal protection of the laws means “the protection of equal laws.” Yick Wo v. Hopkins, Sheriff, 118 *572 (U. S., 356, 369. A law enacted to promote the general welfare is not in violation of this section if it makes no invidious discriminations, but applies equally to all similarly situated. To say that a law is invalid because every individual does not receive the same amount of protection or benefit from its operation would make legislation impossible and would be as wise as to try to shut off the gentle rain from heaven because every man does not get the same quantity of water.
The law is not restricted to any part of the state, but operates uniformly throughout the state and operates uniformly upon all under the same conditions. One man can not constitute a political party, and the abuses that it was intended to prevent depend largely upon the number of those who constitute the party, and this makes it perfectly proper for the legislature to limit the application of the law according to number. The Australian ballot laws limit the party tickets that may appear on the printed ballot, by a percentage of the 'vote cast at a previous election, and in nearly every case in which objection has been made on that ground such laws and legislation have been upheld. Such is the holding in this state in The State, ex rel. Plimmer, v. Poston, 58 Ohio St., 620; and in Gentsch et al. v. The State, ex rel. McGorray et al., 71 Ohio St., 151, 167, where the contention was that a statute, providing that in cities having a population of three hundred thousand or more the polls should close at an earlier hour than elsewhere in the state, was in violation of this section of the constitution, it was held that the statute was valid, and in the opinion it is said: *573 “There may well be differences of opinion as to whether this provision should not apply to cities of less population than the prescribed number; but the law-making power has exercised its judgment on that matter. The limit of population upon which the- classification should be based is entirely within the discretion of the general assembly, having regard to all the conditions 'and circumstances, and so long as it is not unreasonable in its operation or subversive of the rights of electors, we can not interfere with it.”
For present purposes we do not think it important to distinguish the equal protection of the laws, which the fourteenth amendment to The constitution of the United States declares that no state shall deprive any person of, from the declaration in our Bill of Rights that government is instituted for their equal protection and benefit, but assume that what is said respecting the former is not inapplicable to the latter. In Barbier v. Connolly, 113 U. S., 27, 31, Mr. Justice Field at some length points out what was intended by this provision of the fourteenth amendment, and then says: “Special burdens are often necessary for general benefits' — for supplying water, preventing fires, lighting districts, cleaning streets, opening parks, and many other objects. Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed, not to imposé unéqual or unnecessary restrictions upon any one, but to promote, with as little individual inconvenience as possible, the general good. Though, in many respects, necessarily special in their character, they do not furnish just *574 ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects all persons similarly situated, is not within the amendment.” And in Soon Hing v. Crowley, 113 U. S., 703, 708, Mr. Justice Field says: “There is no force in the objection that an unwarrantable discrimination is made against persons engaged in the laundry business, because persons in other kinds of business are not required to cease from their labors during the same hours at night. There may be no risks attending the business of others, certainly not as great as where fires are constantly required to carry them on. The specific regulations for one kind of business, which may bé necessary for the protection of the public, can never be the just ground of complaint because like restrictions are not imposed upon other business of a- different kind. The discriminations which are open to objection are those where persons engaged in the same business are subjected to different restrictions, or are held entitled to different privileges under the same conditions. It is only then that the discrimination can be said to impair that equal right which all can claim in the enforcement of the laws * * *. It is not discriminating legislation in any invidious sense that branches of the same business from which danger is apprehended are prohibited during certain hours of the night, whilst other branches involving no such danger *575 are permitted.” In Cotting v. Kansas City Stock Yards Co. et al., 183 U. S., 79, 111, Mr. Justice Brewer says: “So, again, exercising the undoubted right of classification, it may often happen that some classes are subjected to regulations, and some individuals are burdened with obligations which do not rest upon other classes or other individuals not similarly situated. License taxes are imposed on certain classes of business, while others are exempt. It would practically defeat legislation if it was laid down as a rule that a statute was necessarily adjudged invalid if it did not bring all within its scope, or subject all to the same bur-' dens. It would strip the legislature of its inherent power to determine generally what is for the general interests, which interests may often be promoted by certain regulations affecting one class which do not affect another, certain burdens imposed on one which do not rest upon another.
“But while recognizing to the full extent the impossibility of an imposition of duties and obligations mathematically equal upon all, and also recognizing the right of classification of industries and occupations, we must nevertheless always' remember that the equal protection of the laws is guaranteed, and that such equal protection is denied when upon one of two parties. engaged in the same kind of business and under the same conditions burdens are cast which are not cast upon the other.” In Consolidated Coal Co. of St. Louis v. People of the State of Illinois, 185 U. S., 203, 207, Mr. Justice Brown says: “Another question is whether the act, as amended in 1897, in so far as it discriminates as to penalties imposed *576 upon some persons engaged in the mining business, and not upon others, is a proper exercise of the police power. It is true that the act of 1897 amended the former law of 1895, by limiting its application to coal mines ‘where more than five men are employed at any one time.’ This is a species of classification which the legislature is at liberty to adopt, provided it be not wholly arbitrary or unreasonable, as it was in Cotting v. Kansas City Stock Yards Co., 183 U. S. 79, sub nom Cotting v. Godard, ante, 92, 22 Sup. Ct. Rep., 30, in which an act defining what should constitute public stock yards, and regulating all charges connected therewith, was held to be unconstitutional, because it applied only to one particular company, and not to other companies or corporations engaged in a like business in Kansas, and thereby denied to that company the equal protection of the laws. In the case under consideration there is no attempt arbitrarily to select one mine for inspection, but only to assume that mines which are worked upon so small a scale as to require only five operatives would not be likely to need the careful inspection provided for the larger mines-, where the workings were carried on upon a larger scale or at a greater depth from the surface, and where a much larger force would' be necessary for their successful operation. It is quite evident that a mine which is operated by only five, men could scarcely have passed the experimental stage, or that precautions necessary in the operation of coal mines of ordinary magnitude would be .required in such cases. There was *577 clearly reasonable foundation for a discrimination here.”
The next objection is that Section 2917 delegates legislative power in that it authorizes the controlling committee to prescribe the purpose, time, manner and conditions of the holding of such primary election and the qualifications of electors.
If these matters and every other respecting the nomination of candidates of a political party may be prescribed, as they in the past have been by the party or its committee, thefi the delegation of power is not apparent. There is no delegation of legislative power, but only regulation of a power already possessed by the party.
The next contention is that Section 2919-1, enacted April 20, 1904 (97 O. L., 107), which provides that “no person shall be allowed to • vote at any primary election except he be an elector resident of the precinct, ward or township in_ which he desires to vote and except he voted with the political party holding such primary election at the last general election, providing he voted at all at such election, unless he be a first voter; nor shall any person vote more than one time, or at any other than at the polling place in that precinct, ward or township wherein he resides,” conflicts with Section 1, Article V, of the constitution, which prescribes that, “every male citizen of the United States, of the age of twenty-one years who shall have been a resident of the state one year next preceding the election, and of the county, township or ward in which he resides such time as may be provided by law, shall have the qualifications of an elector, and be entitled to vote at all *578 elections,” in this that it adds to the qualifications that entitle an elector to vote. If this contention is sound, then every elector has the constitutional right to vote at the primary election of every party. If the election is one at which merely the candidates of a party are to be selected, it can not be an objection that electors who do not belong to that party are not permitted to take part. That was one of the evils that the legislation was intended to prevent, and as to the test prescribed for determining an elector’s partizanship it is impossible to conceive of a political party without the possession by its members of some qualifications, and the test prescribed by the statute is the usual one and is not unreasonable.
But a primary election held merely to name the candidates of a political party is not an election within the meaning of this section of the constitution. That section refers to an election of officers, and not to the nomination of candidates.
It is further contended that Section 2 of Article V of the constitution which provides that, “all elections shall be by ballot” is violated by the requirement that only known Republican electors and those who will declare their belief in the principles of the Republican party and their purpose to affiliate with it at the November election, shall be eligible to participate in said primary election, in that it will destroy the secrecy of the ballot. For present purposes it may be assumed that the word “ballot” as here used means a secret ballot, but there is no inhibition against the elector disclosing for whom he voted or intends to vote. Political parties have existed in this state for *579 nearly a century. An elector can not belong to one without impliedly disclosing for whom he has voted or for whom he will vote, and in view of the party practice as it has so long prevailed of prescribing a requirement, like that in the statute, as a test of an elector’s right to act with the party, it is not apprehended that it will be contended that the practice has been in violation of the constitution, and if not, then it does not become so merely because it is recognized by the statute. Affiliation with the party and participation in the primary still are voluntary. Moreover, compliance with the requirement will not disclose that the elector voted for any particular candidate.
It is also contended that the statutes conflict with Section 26 of Article II because there are special statutes for holding primary elections in Butler, Gallia and Hamilton counties. The sections of the statutes to which reference has heretofore been made are general and have a uniform operation throughout the state, and nothing in them limits their operation geographically. It does not appear that any attempt will be made to hold primaries under the special statutes, and we do not deem it necessary to consider them because if the contention respecting them is sound, it does not affect the general statutes.
Numerous objections are made, on the ground of unfairness and unreasonableness, to various provisions of the mode in which the controlling committees, under the call of the state committee, have determined that primary elections shall be held, but we do not think they present any question for our determination. Political parties are *580 voluntary organizations. They have been a law unto themselves, and they determine for themselves all questions of fairness and reasonableness and of party expediency, until the state interferes by legislation, and then no question can arise for judicial determination excepting out of the legislation. Our statutes are not mandatory. The statute, so fár as present legislation goes, only consents upon request by a political party to supply the facilities for holding the contest in the party and to act as umpire. The controlling committee acts with the knowledge that the organization is voluntary, and the members remain with knowl-edge that the party is boss.

Affirmed.

Shauck, C. J., Price, Crew and Spear, JJ., concur.