## CAROLINE S. TEPEL v. WILLIAM SIMA.[1]

December 31, 1942.

No. 33,166.

[1]Reported in 7 N. W. (2d) 532.

*Robins & Davis,* for appellant.

*George G. Chapin,* for respondent.

*J. A. A. Burnquist,* Attorney General, and *George B. Sjoselius,* Assistant Attorney General, *amici curiae.*

STREISSGUTH, JUSTICE.

Action by a married woman to recover from her former employer the difference between wages actually paid her and the minimum

wages prescribed by order of the industrial commission, with penalties and attorneys' fees. The trial court directed a verdict for the employer upon the theory that the minimum wage order relied on did not apply to an employment of the character involved. The appeal is from an order denying plaintiff's motion for a new trial.

■ In determining the correctness of the order below, we must here view the testimony in the light most favorable to plaintiff, reversing the usual method of approach in cases where a court or jury has passed upon fact issues. It must be assumed that all facts shown by plaintiff's evidence and all fair inferences therefrom are established. 6 Dunnell, Dig. & Supp. § 9764, n. 43, 48f; Walkup v. Bardsley (8 Cir.) 111 F. (2d) 789; Stolte v. Larkin (8 Cir.) 110 F. (2d) 226.

■ Defendant conducted his own bakery in St. Paul in a small store divided by a partition into the bakery proper—with oven, mixer, and other equipment—and a shop where his wares were displayed. All his products were baked by himself and sold and delivered to his customers at the shop. His gross receipts were from $15 to $20 per day.

Up to 1939 defendant and his wife operated the business without outside help. Defendant would customarily start work early in the morning, do his day's baking, and usually finish between nine and ten o'clock in the morning. He would then move into the front part of his shop and assume the role of salesman, usually until some part of the afternoon. His wife would report at the shop at about eight in the morning and continue working until relieved by her husband.

Plaintiff, a friend of the Simas, was a married woman living with and supported solely by her husband up to the time she was employed by defendant. She had no children. Sometime late in 1938, after the Simas quit business at a former location, they offered her the job of clerking at the bakery "at $1.50 a day from eight in the morning until six in the evening." Mrs. Sima claimed that she told plaintiff that Mr. Sima was not planning on hiring anyone regularly, but preferred to hire someone to relieve her from

her housework and thereby permit her to act as clerk at the bakery; that she could get someone at the home for $1.50 per day; and that her husband could afford that much for a clerk at the bakery. This, however, was denied by plaintiff. The preliminary discussion between the parties was followed by other discussions of similar import and finally resulted in an agreement whereby plaintiff agreed to work at the bakery shop as needed for $1.50 per day. She started working under this arrangement on Wednesday, January 4, 1939.

During January 1939 plaintiff worked six days, consisting of four Wednesdays and two Saturdays. Her hours were from eight a. m. until six p. m. She lunched at the shop. In February she worked each Wednesday and Thursday. In March she began working regularly on Mondays, Wednesdays, and Thursdays, with the same working hours, which schedule continued until the second week in April, when the Simas took a vacation and plaintiff worked continuously from Monday through Saturday. Upon the Simas' return, plaintiff resumed the former schedule of Mondays, Wednesdays, and Thursdays of each week until July, when she took a week's vacation. Her vacation over, she returned and worked regularly on Mondays, Wednesdays, and Thursdays of each week until July 1940, when she took another week's vacation. After that vacation she continued working on the former schedule of Mondays, Wednesdays, and Thursdays until September 11, 1940, except that on the Saturday preceding Labor Day she substituted for Mrs. Sima. On September 11 an investigator of the state industrial commission appeared at the bakery and inquired about plaintiff's hours of employment, wages, etc. Defendant immediately accused plaintiff of "turning them in" and discharged her.

Plaintiff contends that as a regular employe she was entitled to a minimum wage of 36 cents per hour, the rate specified under Minimum Wage Order No. 13 adopted by the industrial commission under authority of L. 1921, c. 84; L. 1913, c. 547, as amended by L. 1923, c. 153 (Minn. St. 1941, c. 177 [Mason St. 1927, § 4210, et seq.]), less allowances for meals, but with penalties and attor-

neys' fees. That order became effective July 11, 1938. It classified cities, towns, and villages into four classes according to population. Minimum wages were thereby prescribed for cities of Class A, which included St. Paul, as follows:

"$15.00 per week of 36 to 48 hours; 36c per hour for each additional hour over 48; 36c per hour when employed less than 36 hours per week."

The constitutionality of minimum wage legislation can no longer be successfully attacked in view of the latest pronouncements of the United States Supreme Court in West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 S. Ct. 578, 81 L. ed. 703, 108 A. L. R. 1330; United States v. Darby, 312 U. S. 100, 61 S. Ct. 451, 85 L. ed. 609; Opp Cotton Mills, Inc. v. Administrator, 312 U. S. 126, 657, 61 S. Ct. 524, 85 L. ed. 624. As early as 1917 this court had declared our original statute constitutional (Williams v. Evans, 139 Minn. 32, 165 N. W. 495, 166 N. W. 504, L. R. A. 1918F, 542), but the enforcement of the statute was virtually in suspension for several years after the United States Supreme Court, in Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 67 L. ed. 785, 24 A. L. R. 1238, had declared such legislation invalid and until that decision was overruled in the Parrish case, 300 U. S. 379, 57 S. Ct. 578, 81 L. ed. 703, 108 A. L. R. 1330.

The power of the industrial commission to fix minimum wage scales by the terms of our statute extends to wages of "women and minors in *any* occupation in this state." Minn. St. 1941, § 177.03 (Mason St. 1927, § 4214). "Occupation" is defined to mean "*any* business, industry, trade, or branch of a trade in which women or minors are employed." *Id.* § 177.02, subd. 9 (§ 4232 [8]). (Italics supplied.)

No one can suggest any constitutional distinction between employment in a bakery and employment in any other kind of manufacturing or retail establishment which should make a minimum wage for women in the one invalid and the same minimum in the other permissible. No occupation being specifically excepted from

the operation of the statute, the commission was clearly authorized by proper investigation, hearing, and order to make the act applicable to bakeries.

■ The order here under review does not apply specifically to bakeries. It is a general order reciting that "no employer in the state of Minnesota shall employ any woman or minor * * * in any occupation at a lesser wage," etc., and defining "occupation" in the statutory language as "any business, industry, trade, or branch of trade in which women or minors are employed."

Is this such a blanket order as is condemned in G. O. Miller Tel. Co. v. Minimum Wage Comm. 145 Minn. 262, 177 N. W. 341, and in People v. Johnson, 42 Cal. App. (2d) 827, 109 P. (2d) 770? In the Miller case it was declared (145 Minn. 267, 177 N. W. 343):

"* * * the legal minimum wage which it [statute] authorizes the commission to fix is not a blanket minimum wage throughout the state for women or for minors, without reference to wage conditions in the different occupations, but is a minimum wage based on the different occupations and fixed after an investigation and determination of wage conditions therein." Mr. Justice Dibell pointed out that the statute "reaches a single occupation in which one-sixth of the workers are paid less than a living wage. It does not reach an occupation, unless such condition exists, though one-sixth of the entire body of workers in all occupations receive less than a living wage."

Nevertheless, Order No. 10 there under review was held valid, and this notwithstanding the order recited that after an investigation the commission was (145 Minn. 268, 177 N. W. 343) "of the opinion that the wages paid to one-sixth or more of the women and minors employed in this state are less than living wages," it appearing from the facts admitted that the recital was untrue and that the commission had, in fact, after a complete investigation, arrived at (145 Minn. 270, 177 N. W. 344) "the opinion that more than one-sixth of the women and more than one-sixth of the minors employed in the state in each and every occupation were receiv-

ing less than a living wage at the time the orders complained of were issued." It was pointed out that (145 Minn. 269, 177 N. W. 344) "a formal finding or a recital of the opinion of the commission" was not required by statute, and that an inaccurate or erroneous recital did not (145 Minn. 270, 177 N. W. 344) "control the facts * * * or make the order invalid."

As an aside, we confess to being somewhat at a loss to understand how the court could attribute to the order a virtue it did not possess by eliminating a formal recital therein as surplusage or as contrary to the fact. (See Railroad Comm. v. L. & N. R. Co. 197 Ala. 161, 72 So. 397.) The Miller case, 145 Minn. 262, 177 N. W. 341, is in no event authority for the proposition that the commission could make a valid order without a proper investigation of the facts relative to each occupation. If the order rested upon an erroneous rule, if it was based upon findings made without evidence, or upon evidence which clearly did not support it, the order could be set aside in a direct attack thereon in a proceeding to which the commission was made a party. Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. ed. 524; Western Union Tel. Co. v. Industrial Comm. (D. C.) 24 F. Supp. 370; Alabama Power Co. v. City of Fort Payne, 237 Ala. 459, 187 So. 632, 123 A. L. R. 1337, and note.

In support of Order No. 13 here under review, it was stipulated at the trial below:

"* * * if Commissioner J. D. Williams of the Industrial Commission were called to testify in this case that he would testify as follows:

"Q. And before the order was formulated and issued by your department were you satisfied that a thorough and extensive investigation had been made?

"A. Yes.

"Q. You were, and were you further of the opinion prior to the actual order number thirteen that more than one-sixth of the women and more than one-sixth of the minors employed in the state

in each and every occupation were receiving less than a living wage at the time you formulated that order?

"A. Yes."

This testimony, under the rule of the Miller case, was sufficient to sustain Order No. 13 against the charge that it was a blanket order. The commission might more properly have investigated one occupation at a time, but there could be no fatal objection to its investigating all occupations together and to its making one order applying to "each and every occupation," provided always that it found as a fact that "more than one-sixth of the women and more than one-sixth of the minors employed in the state *in each and every occupation* were receiving less than a living wage at the time" (italics supplied), as the testimony of Commissioner Williams shows was done before the adoption of Order No. 13.

Whether or not the fact basis for an administrative order can be attacked collaterally in a court proceeding is an interesting question. See 4 Dunnell, Dig. § 6885; 31 Am. Jur., Judgments, pp. 181, 189, 195, 200, §§ 583, 590, 598, 604; 34 C. J. p. 519, § 826; Pillsbury, "Administrative Tribunals," 36 Harv. L. Rev. 583; Johnson v. Towsley, 80 U. S. (Wall.) 72, 20 L. ed. 485; Alabama Power Co. v. City of Fort Payne, 237 Ala. 459, 187 So. 632, 123 A. L. R. 1337; May v. Penton, 45 Wyo. 82, 16 P. (2d) 35; Opinion of the Justices, 87 N. H. 492, 179 A. 344, 357, 110 A. L. R. 819. It is unimportant here, because no evidence was offered to overcome the presumption of validity or the *prima facie* case established by Commissioner Williams' testimony.

We are not unaware of the fact that in 1938 the United States District Court of Minnesota, in a direct attack upon Order No. 13, issued a writ of temporary injunction against its enforcement based on affidavits showing irregularities in the procedure followed by the industrial commission in adopting the order. (Western Union Tel. Co. v. Industrial Comm. [D. C. Minn.] 24 F. Supp. 370, *supra.*) This case was not called to our attention in the briefs of the attorney general in behalf of the commission, or otherwise.

We are not advised whether that case was ever tried on the merits; we are therefore at a loss to understand how, in the face of that injunctive order, the commission still persists in enforcing its Order No. 13.

So far as the record in the instant case is concerned, it is entirely barren as to how the commission reached its decision culminating in Order No. 13, and we must presume that the order was a valid one, made after proper hearing, complying with the requirements of "due process."

■ A further ground urged as a defense here was that plaintiff's employment was intermittent and that she was not engaged therein for a livelihood. Defendant relies upon the following language in the Miller case (145 Minn. 271, 272, 177 N. W. 344):

"The minimum wage statute applies to workers working at an occupation for a livelihood. Its purpose is to provide against employing at less than a living wage, for a period which substantially covers an ordinary work week or other work period. It does not apply to those engaged in some calling or in no calling, who engage their services for a small work day period or who do intermittent service.

*     *     *     *     *

"It is * * * the purpose of the minimum wage act to reach occupations which furnish the substantial livelihood to workers therein and consume their ordinary work period and not to include workers who do some slight or intermittent daily or weekly service."

That language, as the opinion shows, was directed at a situation such as that where a telephone exchange is maintained in a store, post office, or dwelling and serviced by a woman who is either (145 Minn. 271, 177 N. W. 345) "a salesman, the postmaster, the house-wife or some other member of the family, if the exchange is in a home," and who is employed (145 Minn. 272, 177 N. W. 345) "probably not to exceed 2 hours a day, or 14 hours a week." It cannot be extended to a situation such as here, where plaintiff

was regularly employed eight to ten hours a day on three days of each week for a period of over a year. Evans v. Hartman, 5 Wash. 434, 105 P. (2d) 717. Granted that "neither the law nor the order * * * required the payment of the weekly minimum when the employee does not devote her time to the earning of a living wage, but in connection with another calling, or with no calling, works a few hours per day, or a few hours per week, or renders intermittent service" (Sparks v. Moritz, 141 Wash. 417, 251 P. 583, 584), such is not the case here.

Plaintiff's employment was as regular as the needs of the defendant's business required. She put in a full working day regularly on Mondays, Wednesdays, and Thursdays of each week and cannot be held to be engaged in "slight or intermittent" service because the number of working hours per week was not in the 36- to 48-hour bracket specified in Order No. 13.

The word "intermittent" obviously was used in the Miller and Sparks cases as antithetic to "regular" or "constant" and not in the strict sense of meaning "periodic" or "recurrent"; for, in the latter sense, even an employment at eight hours a day, six days a week, would be intermittent. It is more accurate to say that, to be excluded from the operation of the minimum wage act, the employment must be slight or casual and at irregular intervals. Employment is not casual if it is for a part of one's time at regularly recurring periods. Hoard v. Sears, Roebuck & Co. Inc. 122 Conn. 185, 188 A. 269.

In Williams v. Evans, 139 Minn. 32, 44, 165 N. W. 495, 498, L. R. A. 1918F, 542, *supra*, this court expressly recognized that "cases of minor or negligible importance" were not within the purview of the law, but plaintiff's case cannot be placed in such category.

In the application of the law, cases in the twilight zone between intermittent and regular employment may occasionally arise, and it may be that employers very near the dividing line will be acting under practically the same conditions as those on the other side of it; but we must look to general results and practical divi-

sion and leave to the courts the duty of fairly and reasonably applying the distinction between intermittent and regular employment. But where, as here, upon admitted facts the trial court has obviously made an error in its classification, the error should be corrected.

■ Whether the legislature could constitutionally have exempted employers of only one woman worker is at least debatable, since clearly the law was enacted for the benefit of women wage earners and not employers, and the number of women employed in a single establishment does not appear to have any logical relationship to the question whether the wages paid are living wages. (But, see Consolidated Coal Co. v. Illinois, 185 U. S. 203, 22 S. Ct. 616, 46 L. ed. 872; Jeffrey Mfg. Co. v. Blagg, 235 U. S. 571, 35 S. Ct. 167, 59 L. ed. 364; McLean v. Arkansas, 211 U. S. 539, 29 S. Ct. 206, 53 L. ed. 315.) Here, however, neither the legislature nor the industrial commission has attempted any classification based on the number of employes. Order No. 13 must therefore be held to apply to the situation here under review even though defendant had but one employe.

■ It must be conceded that the payment of minimum wages by a baker operating on a small scale may spell the difference between profit and loss. The facts of the instant case would appeal to any court, as they did to the trial court, as working a special hardship and injustice. But that a statute of general application may work an injustice or hardship in a particular case has never been recognized as a valid objection to its application to a particular case. Wickard v. Filburn, 317 U. S. 111, 63 S. Ct. 82, 87 L. ed. . . . . ; Jeffrey Mfg. Co. v. Blagg, 235 U. S. 571, 35 S. Ct. 167, 59 L. ed. 364, *supra;* Columbus & G. Ry. Co. v. Administrator of Wage & Hour Div. (5 Cir.) 126 F. (2d) 136. And, as said by Mr. Chief Justice Taft in his dissent in Adkins v. Children's Hospital, 261 U. S. 525, 563, 43 S. Ct. 394, 403, 67 L. ed. 785, 24 A. L. R. 1238:

"* * * while in individual cases hardship may result, the restriction will inure to the benefit of the general class of employees

in whose interest the law is passed and so to that of the community at large."

■ The final question is whether the benefits of the act should extend to a married woman living with her husband and receiving support from him who seeks part-time employment to supplement the earnings of her husband. It is urged that the sole justification for minimum wage legislation as applied to women is that, because of their sex, women are, as a matter of public policy, entitled to special protection in order that they "might meet the exigencies of existence" (West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 S. Ct. 578, 81 L. ed. 703, 108 A. L. R. 1330), or "the cost of reasonable living" (Williams v. Evans, 139 Minn. 32, 40, 165 N. W. 495, L. R. A. 1918F, 542) ; hence, that the protection of such statute cannot extend to a married woman living with and supported by her husband. This argument loses its entire force in the face of the most recent pronouncement of the United States Supreme Court sustaining wage and hour legislation applicable alike to both men and women. United States v. Darby, 312 U. S. 100, 657, 61 S. Ct. 451, 85 L. ed. 609, 132 A. L. R. 1430, *supra.*

Our attention is also directed to the statutory definition of the term "living wages" to mean "wages sufficient to maintain the worker in health and supply him with the necessary comforts and conditions of reasonable life" (Minn. St. 1941, § 177.02, subd. 2 [Mason St. 1927, § 4232(1)]), and to the statutory direction that "the commission shall determine the minimum wages sufficient for living wages for women and minors." Minn. St. 1941, § 177.07, subd. 1 (Mason St. 1927, § 4218).

Unquestionably, as said by Mr. Justice Dibell:

"The minimum wage statute applies to workers working at an occupation for a livelihood. Its purpose is to provide against employing at less than a living wage." G. O. Miller Tel. Co. v. Minimum Wage Comm. 145 Minn. 262, 271, 177 N. W. 341, 344.

But, as pointed out by Mr. Chief Justice Hughes in the Parrish case, 300 U. S. 399, 57 S. Ct. 585, 81 L. ed. 703, 108 A. L. R. 1330:

"The legislature had the right to consider that its minimum wage requirements would be an important aid in carrying out its policy of protection" to women generally. It is significant that that suit, against the West Coast Hotel Company, was brought by husband and wife; yet the fact that Mrs. Parrish had a husband was not considered important enough to mention as a factor in determining her rights.

The fact that the statute applies to all women without respect to their married or economic status cannot affect its validity. It was intended for the benefit of all women and of society generally. And no court, without usurping legislative powers, can write into the statute an exception or saving clause which is not there. If the act were held not to apply to married women with supporting husbands, unscrupulous employers might deliberately employ married women at less than the prescribed minimum wages to the exclusion of unmarried women, thereby creating unemployment for the latter. Instead of receiving living wages, a large number of unmarried women would thus receive no wages at all, and the very purpose of the entire legislation would be defeated.

The phenomenon of both husband and wife seeking employment to improve their mutual standard of living is no longer uncommon, and the fact that the earnings of a husband may be sufficient to meet the bare necessities of living does not mean that his wife too is not earning a "livelihood" when she contributes her labor to raise the living standards of both.

For reasons we have indicated, the lower court erred in directing a verdict for defendant, and there must be a new trial. But, in view of the decision in Western Union Tel. Co. v. Industrial Comm. (D. C.) 24 F. Supp. 370, we deem it proper to suggest that before a second trial the lower court grant defendant a reasonable opportunity to attack Order No. 13 in a direct proceeding upon the grounds stated in that decision.

Reversed.

PIRSIG, JUSTICE (concurring specially).

I concur except with respect to what is said concerning Order No. 13. I do not see the need, and consider it unwise, to hold out to the defendant the prospect that if he will but raise the point this court will lend a ready ear to the contention that the order is invalid. Having been invited to bring the case here again, he may find himself disappointed, and this court embarrassed, if, on full presentation of the question, it is found that the order is a valid one.

